CROWELL & MORING LLP
John D. Vandevelde (CSB No. 67881)
jvandevelde@crowell.com
Nathanial J. Wood (CSB No. 223547)
nwood@crowell.com
515 S. Flower Street, 40th Floor
Los Angeles, California 90071
Telephone: 213-622-4750
Facsimile: 213-622-2690

Attorneys for Defendant
Crowell & Moring LLP

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| GARGI DAVÉ and GIATRI DAVÉ,<br><br>Plaintiffs,<br><br>v.<br><br>CROWELL AND MORING LLP,<br>and the PAN AM FLIGHT 73<br>LIAISON GROUP,<br><br>Defendants. | Case No. CV10-00172 GAF (PLAx)<br><br>**DEFENDANT CROWELL &<br>MORING LLP'S MEMORANDUM<br>OF POINTS AND AUTHORITIES IN<br>SUPPORT OF MOTION TO<br>DISMISS UNDER FED. R. CIV. P.<br>19(b) OR TO TRANSFER UNDER 28<br>U.S.C. § 1404(A)**<br><br>Date:     March 15, 2010<br>Time:    9:30 a.m.<br>Ctrm:   704 – Roybal |

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................1

STATEMENT OF FACTS .......................................................................3

I.    The Hijacking of Pan Am Flight 73 ...............................................3

II.   The Plaintiffs Seek Crowell & Moring's Assistance In Prosecuting Claims Against Libya.......................................................3

III.  The Joint Prosecution Agreement .................................................3

IV.  C&M's Prosecution Of The Claims ...............................................5

V.   Libya And The United States Enter A Global Settlement Of Terrorism Claims And Create A Settlement Fund To Compensate The Victims ...................................................................6

VI.  The Pan Am Flight 73 Resolution Trust .......................................8

VII. The Davés Refuse To Deposit Funds From The FCSC In The Trust And File Suit, Threatening The Interests Of All Other Parties To The JPA .........................................................................8

ARGUMENT .........................................................................................10

I.    Given the Inability to Join Necessary Parties in This Action, The Court Must Determine Whether "In Equity and Good Conscience" the Case Should Proceed or Should Be Dismissed........10

II.   Transfer Under 28 U.S.C. § 1404 Is Proper Where It Promotes Convenience and the Interests of Justice ....................................11

CONCLUSION......................................................................................25

CROWELL & MORING LLP
ATTORNEYS AT LAW

DEF. CROWELL & MORING'S MEMO. OF POINTS AND AUTH. IN SUPPORT OF MOTION TO DISMISS;; CASE NO. CV10-00172 GAF (PLAX)

# TABLE OF AUTHORITIES

**Page**

## CASES

*Brinderson-Newberg Joint Venture v. Pac. Erectors, Inc.*,
690 F. Supp. 891 (C.D. Cal. 1988) ................................................................ 13

*Decker Coal Co. v. Commonwealth Edison Co.*,
805 F.2d 834 (9th Cir. 1986) ..................................................................... 13

*Deltakeeper v. Oakdale Irrigation Dist.*,
94 Cal. App. 4th 1092 (2001) .................................................................... 16

*Doctor's Assocs., Inc. v. Stuart*,
85 F.3d 975 (2d Cir. 1996) ......................................................... 12, 14, 19

*Dominium Austin Partners, L.L.C. v. Emerson*,
248 F.3d 720 (8th Cir. 2001) ............................................................ 14, 19

*Eldredge v. Carpenters 46 N. Cal. Counties Joint Apprenticeship and
Training Comm.*,
662 F.2d 534 (9th Cir. 1981) ..................................................................... 18

*Fireman's Fund Ins. Co. v. Nat'l Bank of Coops.*,
103 F.3d 888 (9th Cir. 1996) ..................................................... 12, 14, 19

*Florens Container v. Cho Yang Shipping*,
245 F. Supp. 2d 1086 (N.D. Cal. 2002) ............................................. 11, 24

*Fontaine v. Wash. Mut. Bank, Inc.*,
2009 WL 1202886 (C.D. Cal. April 30, 2009) ........................................ 22

*Hansen v. Peoples Bank of Bloomington*,
594 F.2d 1149 (7th Cir. 1979) ................................................................... 17

*Hoffman v. Blaski*,
363 U.S. 335 (1960) ................................................................................... 11

*IBM Credit Corp. v. Definitive Computer Servs., Inc.*,
1996 WL 101172 (N.D. Cal. Feb. 28, 1996) ............................................ 24

*In re Ricoh Corp.*,
870 F.2d 570 (11th Cir. 1989) ................................................................... 24

*Jones v. GNC Franchising, Inc.*,
211 F.3d 495 (9th Cir. 2000) ..................................................................... 11

*Jumara v. State Farm Ins. Co.*,
55 F.3d 873 (3d Cir. 1995) ........................................................................ 24

*Kelly v. Qualitest Pharm., Inc.*,
2006 WL 2536627 (E.D. Cal. Aug. 31, 2006) ......................................... 13

*Makah Indian Tribe v. Verity*,
910 F.2d 555 (9th Cir. 1990) ..................................................................... 17

*Manjula Patel v. The Socialist People's Libyan Arab Jamahiriya*,
(D.D.C.) Civil Action No. 06-CV-00626 ................................................... 6

*Optopics Labs. Corp. v. Nicholas*,
947 F. Supp. 817 (D. N.J. 1996) ................................................. 13, 20, 24, 25

CROWELL
& MORING LLP
ATTORNEYS AT LAW

-ii-

DEF. CROWELL & MORING'S MEMO. OF POINTS
AND AUTH. IN SUPPORT OF MOTION TO DISMISS;
CASE NO. CV10-00172 GAF (PLAX)

1

## TABLE OF AUTHORITIES
### (continued)

2

Page

3

*QAI, Inc. v. Sprint Comms. Co.,*
120 F. Supp. 2d 1218 (C.D. Cal. 2000) ............................................................20

4

*Republic of Philippines v. Pimentel,*
__ U.S. __, 128 S.Ct. 2180 (2008) ...................................................................18

5

*RFG Corp. v. Audio Data Video Enters.,LLC,*
2008 WL 5001382 (E.D. Cal. Nov. 24, 2008) ..................................................13

6

*Scherk v. Alberto-Culver Co.,*
417 U.S. 506 (1974) ...........................................................................................13

7

*Shermoen v. United States,*
982 F.2d 1312 (9th Cir. 1992) ...........................................................................17

8

*Sierra Club v. Leathers,*
754 F.2d 952 (11th Cir. 1985) ...........................................................................14

9

*Stewart Org., Inc. v. Ricoh Corp.,*
487 U.S. 22 (1988) .............................................................................................13

10

*Stonehenge, Ltd. v. Garcia,*
989 F. Supp. 539 (S.D.N.Y. 1998) ....................................................................13

11

*Textile Unlimited, Inc. v. A..BMH & Co.,*
240 F.3d 781 (9th Cir. 2001) .............................................................................20

12

*Unisys Corp. v. Access Co., Ltd.,*
2005 WL 3157457 (N.D. Cal. Nov. 23, 2005) ..................................................24

13

*Van Dusen v. Barrack,*
376 U.S. 612 (1964) .....................................................................................11, 25

14

*Virginia Sur. Co. v. Northrop Grumman Corp.,*
144 F.3d 1243 (9th Cir. 1998) ...........................................................................16

15

*Wilbur v. Locke,*
423 F.3d 1101 (9th Cir. 2005) .......................................................15, 16, 17, 18

16

### STATUTES

28 U.S.C. § 1331 ......................................................................................................12

28 U.S.C. § 1391 ......................................................................................................13

28 U.S.C. § 1404(a) .............................................................................................2, 11

9 U.S.C. § 4 ..............................................................................................................20

9 U.S.C. §§ 9, 10 .....................................................................................................14

Libyan Claims Resolution Act,
Pub. L. No. 110-301, 122 Stat. 2999 (2008) .......................................................7

### RULES

Fed. R. Civ. P. 19(a) ...............................................................................................14

Fed. R. Civ. P. 19(a)(1)(B) ..........................................................................10, 15, 20

Fed. R. Civ. P. 19(b) ...............................................................................................18

17

18

19

20

21

22

23

24

25

26

27

28

CROWELL
& MORING LLP
ATTORNEYS AT LAW

-iii-

DEF. CROWELL & MORING'S MEMO. OF POINTS
AND AUTH. IN SUPPORT OF MOTION TO DISMISS;
CASE NO. CV10-00172 GAF (PLAX)

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**INTRODUCTION**

By this action, Plaintiffs Gargi and Giatri Davé seek to nullify or avoid, in whole or in part, a contract – the Joint Prosecution Agreement or "JPA" – that they entered into with 176 other parties in the United States and abroad, all victims of a terrorist attack sponsored by Libya.  Not only do Plaintiffs seek to invalidate the JPA, but also as a first order of business, they want to nullify or avoid its arbitration clause.  They also seek to declare their retention agreements with Defendant Crowell & Moring LLP ("C&M") null and void as a matter of federal law.

The JPA provides for the pooling of recoveries (and expenses) on claims against Libya and its agents, subject to a final distribution among all signatories in accordance with an agreed-to formula.  Plaintiffs have done the math and determined that a distribution according to the JPA formula will not be as favorable to them as simply taking their recovery for themselves – and not sharing it with the other signatories.  (This is especially clear since the *expenses* arising from prosecution of their claims are being borne by the other signatories to the JPA).  Thus, they seek to nullify or avoid the agreement, or at least (in several counts) the provisions that would require them to share the recovery with foreign nationals (apparently because if the pooling is only between U.S. claimants, the Davés might actually do better under the JPA sharing formula than simply retaining their recoveries for themselves).

In any event, as presently structured, the lawsuit is ill-conceived and is not being pursued in a suitable forum.  Given the inherent difficulties associated with trying to adjudicate disputes involving a contract signed by 178 parties, the JPA itself sets forth a workable mechanism for resolving such disputes, namely, through mediation and then arbitration venued in D.C., the locus of the action.  Yet with this filing, Plaintiffs seek to deprive the 176 other contracting parties (or, at least, the foreign nationals) of their rights to share in their recovery under the JPA, without

CROWELL
& MORING LLP
ATTORNEYS AT LAW

DEF. CROWELL & MORING'S MEMO. OF POINTS
AND AUTH. IN SUPPORT OF MOTION TO DISMISS;
CASE NO. CV10-00172 GAF (PLAX)

1  actually including those other parties in the suit.  Indeed, most of the absent parties

2  cannot be joined in this Court because they reside outside California or overseas, so

3  under Rule 19(b), the Court must decide whether "in equity and good conscience,"

4  the action should proceed, or be dismissed.  If this action is to proceed at all, the

5  interests of the absent parties can best and most practically be protected by

6  transferring the case, pursuant to 28 U.S.C. § 1404(a), to the District of Columbia.

7  The reasons are clear:

8      First, Plaintiffs have agreed to adjudicate their claims in D.C., specifically,

9  before an arbitration panel.  Forum selection clauses agreed to by contracting

10  parties presumptively control the choice of forum for resolution of disputes relating

11  to the contract, including disputes about enforceability of an arbitration agreement.

12      Second, D.C. is the only forum in which all of the parties with an interest in

13  the JPA, and arbitration under the JPA, can be given the opportunity to participate

14  in resolution of this dispute.  Plaintiffs have sought to rescind the JPA, extinguish

15  the rights of 176 other parties to share in their recovery, avoid their obligation to

16  pay the expenses incurred by the 178 parties, and nullify the arbitration clause

17  established to resolve disputes among the parties.  But they purport to do so in a

18  lawsuit that fails to join the over 170 other signatories to the contract, all of whom

19  have an interest in its continued viability and enforcement.  The need to protect the

20  interests of the other parties to the agreement – particularly the foreign nationals

21  who are a specific target of Plaintiffs' claims – should be paramount.  Those

22  interests are best protected by requiring Plaintiffs to go forward in a venue for

23  dispute resolution to which all parties to the JPA consented.  D.C. is the only forum

24  in which all interested parties can appropriately be asked to protect their interests.

25      Third, this is fundamentally a dispute with a D.C. locus.  The many C&M

26  professionals who have worked with Plaintiffs and the other JPA parties in pursuing

27  their claims over the past six years, reside there.  The JPA was largely conceived

28  and administered there.  The claims have been prosecuted there, both in federal

CROWELL
& MORING LLP
ATTORNEYS AT LAW

-2-

DEF. CROWELL & MORING'S MEMO. OF POINTS
AND AUTH. IN SUPPORT OF MOTION TO DISMISS;
CASE NO. CV10-00172 GAF (PLAX)

1    court, in discussions with the State Department, in connection with distributions

2    from the global settlement by the State Department, and now before the Federal

3    Claims Settlement Commission.  D.C. is where virtually all of the relevant

4    documents are located.  Moreover, it is where the Trust was established to hold

5    funds for the benefit of the JPA signatories.  The ease of access to witnesses and

6    other proof, as well as the interests of justice, weigh heavily in favor of transfer.

7                              **STATEMENT OF FACTS**

8    **I.     The Hijacking of Pan Am Flight 73**

9            On September 5, 1986, Pan Am Flight 73 was hijacked by a group of

10   terrorists, supported by Libya and its agents.  The terrorists held passengers and

11   crew hostage for sixteen hours, under horrific conditions, killing 20 and injuring

12   scores of others.  Decl. of Stuart H. Newberger in Support of Defendant Crowell &

13   Moring's Motion to Dismiss or Transfer ("Newberger Decl.") ¶ 2.

14   **II.    The Plaintiffs Seek Crowell & Moring's Assistance In Prosecuting
            Claims Against Libya**

15          C&M is a law firm with its headquarters in Washington, D.C.  *Id.* at ¶ 1.  In

16   December 2003, many of the Pan Am Flight 73 victims and families attended the

17   sentencing hearing in Washington of Zaid Hassan Abd Latif Safarini, one of the

18   principals in the hijacking.  Several of them at that time were interested in creating

19   some kind of memorial for the victims.  In June 2004, shortly after learning of

20   Libya's likely involvement in the hijacking, members of that group, both U.S.

21   citizens and foreign nationals, contacted C&M in Washington, expressing an

22   interest in pursuing claims against Libya for the benefit of Pan Am 73 victims.  *Id.*

23   at ¶ 3.

24   **III.   The Joint Prosecution Agreement**

25          Between October 15, 2004, and April 21, 2006, the original group who came

26   to C&M joined with other Pan Am Flight 73 victims to pool their claims pursuant

27   to a Joint Prosecution Agreement.  Newberger Decl., Ex. 5.  That agreement had

28

1    been drafted in D.C. and was ultimately signed by 178 of the victims, including

2    Plaintiffs.

3           The JPA parties agreed upon a pre-determined formula for pooling and

4    allocating recoveries.  The JPA sets forth the rationale for that approach:

5                  [T]he Parties desire to avoid potential conflicts between
                   and among the Parties regarding the collection and
6                  distribution of any monies, to ensure that any distribution
                   of any recovery to the Parties herein is accomplished
7                  according to the allocation set forth in this Agreement,
                   and to ensure that each Party herein shall receive a fair
8                  and appropriate distribution of any recoveries according
                   to this Agreement; [Newberger Decl. Ex. A, at 10th
9                  Recital, at 4.]

10                 [T]he distribution formula . . . will apply to all victims
                   regardless of age, gender, marital status, number of family
11                 members, nationality, or national origin.  The allocation . .
                   . shall be divided in the following manner, regardless of
12                 whether the monies received are the result of a court
                   judgment, settlement, mediation, arbitration, collection or
13                 other method . . . [*Id.* at ¶ 5.]

14          The allocation formula applies to any "financial recovery against the

15   Defendants responsible for the Pan Am 73 attack, (whether by settlement, judgment

16   or payment from any source)…"  *Id.* at ¶ 4.  The signatories specifically confirmed

17   that even if "the claims of any Party are dismissed from the case, any dismissed

18   Party shall still be entitled to his/her pro rata share . . . notwithstanding that the

19   Party's claim has been dismissed."  *Id.* at ¶ 5.K.

20          The JPA provides that C&M would be retained to pursue "all legal remedies

21   under U.S. law,"  and that signing a separate retention agreement with C&M was "a

22   condition for entering into this Agreement."  *Id.* at 7th, 11th Recitals, at 3-4.  C&M's

23   retention agreement with each claimant was in turn conditioned on the claimant's

24   signing the JPA.  Newberger Decl., Exs. D & E.   The basis for payment was a

25   contingent fee.  The JPA provides that "[t]o the extent that there is any financial

26   recovery against any of the Defendants, either jointly or severally, either by way of

27   settlement, judgment or other award, all monies shall be deposited in the Crowell &

28   Moring LLP IOLTAA escrow account."  Newberger Decl., Ex. A at ¶ 2.

CROWELL
& MORING LLP
ATTORNEYS AT LAW
                                        -4-         DEF. CROWELL & MORING'S MEMO. OF POINTS
                                                    AND AUTH. IN SUPPORT OF MOTION TO DISMISS;
                                                    CASE NO. CV10-00172 GAF (PLAX)

Plaintiffs signed Joinders to the JPA in 2005, in which each of them affirmed that she had either "been represented by an attorney in the review of the [JPA] and the decision to execute this Joiner, or has had the opportunity to do so, and elected not to do so." Newberger Decl., Exs. B-C.  The Joinders designated C&M as "third party beneficiary and attorneys for the Parties." *Id.*

The JPA created a Liaison Group whose duties "as the managing agent for the Parties under [the JPA] include any and all matters necessary to prosecute the claims of the Parties in any forum, and to act on behalf of the Parties in any manner necessary to prosecute their interests." Newberger Decl., Ex. A at ¶ 6.  From time to time during the course of the investigation and prosecution of Pan Am hijacking victims' claims, the Liaison Group met in D.C.  Newberger Decl. ¶ 7.  The JPA is expressly governed by D.C. law, and the parties agreed that they would, by virtue of the filing in the District, be subject to personal jurisdiction there.  *Id., * Ex. A at ¶ 10.

Even more importantly, the JPA specifies a practical means of addressing the difficult task of resolving disputes that might arise between the 178 parties to the contract.  It provides for mandatory mediation and, if that fails, arbitration in D.C. of disputes between any Parties, including, *inter alia,* disputes over "the construction and enforceability of the Agreement." *Id.* at ¶¶ 13-14.

## IV.  C&M's Prosecution Of The Claims

Before filing suit, C&M conducted an extensive investigation of the evidence available to establish liability against Libya and the individual officials and agents responsible for the attack.  Newberger Decl. ¶ 8.  This included retaining experts with experience in counter-terrorism, filing Freedom of Information Act requests with numerous federal agencies, and reviewing documents to identify factual links between Libya and the attack.  *Id.*  The firm also conducted due diligence interviews with potential plaintiffs, frequently aided by interpreters, to determine the *bona fides* of claims.  *Id.*  This investigation was conducted primarily from

CROWELL
& MORING LLP
ATTORNEYS AT LAW

-5-

DEF. CROWELL & MORING'S MEMO. OF POINTS
AND AUTH. IN SUPPORT OF MOTION TO DISMISS;
CASE NO. CV10-00172 GAF (PLAX)

1    C&M's D.C. office and almost entirely with D.C. attorneys and paralegals. *Id.* at ¶
2    9.

3         C&M prepared and, on April 5, 2006, filed a 150-page Complaint in the
4    United States District Court for the District of Columbia pursuant to special venue
5    provisions allowing for venue of the terrorism suits in D.C. *Manjula Patel v. The*
6    *Socialist People's Libyan Arab Jamahiriya*, (D.D.C.) Civil Action No. 06-CV-
7    00626. *Id.* at ¶ 10 and Ex. F. Libya vigorously contested the *Patel* litigation, which
8    proceeded for nearly two years. *Id.* at ¶ 10.

9         At the same time, C&M was prosecuting two other suits against Libya and its
10   agents in federal court. In 2007, C&M won summary judgment in a contested case,
11   referred to as "*Pugh*," defeated the appeal, and in January 2008, after the damages
12   hearing, obtained a judgment of $4.5 billion (nearly $1.6 billion against Libya
13   alone) – the first and only judgment against Libya in a contested terrorism case.
14   Shortly thereafter, Congress enacted the Lautenberg amendments facilitating
15   judgment enforcement in terrorism cases. *Id.* at ¶ 11.

16        In addition to *Patel* and *Pugh*, there were several additional cases against
17   Libya pending in D.C. Those cases, and those cases alone, were ultimately settled
18   and resolved by the global claims settlement that the United States later
19   implemented with Libya. *Id.* at ¶ 12.

20   **V.    Libya And The United States Enter A Global Settlement Of Terrorism**
21   **      Claims And Create A Settlement Fund To Compensate The Victims.**

22        Shortly after these developments, the Libyan Government approached the
23   U.S. Government about trying to dispose of the pending cases, including the *Pugh*
24   case in which judgment had been entered (but was not yet final), through a "global
25   settlement" orchestrated by the United States government. Newberger Decl. ¶ 13.
26   The negotiations led to enactment of the Libyan Claims Resolution Act ("LCRA")

27
28

on July 31, 2008,[1] under which the United States settled on a global basis all of the terrorism cases then being pursued against Libya, with a fund to be established (by Libya) for distribution to eligible claimants. The LCRA was part of the Administration's overall effort to normalize relations with Libya. Newberger Decl. ¶ 13. That normalization and the settlement were widely regarded as the product of the pressure that these lawsuits had placed upon Libya, especially the *Pugh* judgment against Libya for nearly $1.6 billion.

On October 31, 2008, the President issued Executive Order 13477 directing the Secretary of State to establish procedures governing applications to the settlement fund. *Id.* at ¶ 14. In establishing the basis for recovery from the fund, the State Department consulted extensively with counsel for the claimants in the underlying cases, including with C&M, with respect to a fair method of apportioning the global settlement funds among various cases and claims. *Id.* at ¶ 15.

C&M submitted the claims of three estates of individuals killed in the Pan Am 73 hijacking (including those of two foreign nationals) for approval directly by the State Department and for disbursement of funds by the Treasury. *Id.* at ¶ 16. The three awards, totaling $30 million, were approved by the State Department and paid into the C&M escrow account. *Id.*

The State Department then sought the assistance of the Foreign Claims Settlement Commission ("FCSC"), a Justice Department body, to process the remaining claims, most of which pertain to physical injury and hostage-taking. The FCSC is headquartered in Washington, D.C. Currently, it is conducting proceedings in D.C. to determine qualification for claims payments.. *Id.* at ¶ 17.

C&M's Washington, D.C. office has prepared and submitted the physical injury and hostage claims for all of the eligible members of the JPA. *Id.* at ¶ 18.

---

[1]  Libyan Claims Resolution Act, Pub. L. No. 110-301, 122 Stat. 2999 (2008).

CROWELL
& MORING LLP
ATTORNEYS AT LAW

-7-

DEF. CROWELL & MORING'S MEMO. OF POINTS
AND AUTH. IN SUPPORT OF MOTION TO DISMISS;
CASE NO. CV10-00172 GAF (PLAX)

1    C&M has retained medical experts, obtained supporting documents from around

2    the world, and made detailed submissions, including presenting witnesses to the

3    FCSC.  *Id.*  Expenses (e.g. for medical reports) for one plaintiff have not been

4    directly allocated to that claimants' particular claim, but associated with the entirety

5    of the claims because the objective is to maximize the total net recovery.  *Id.*  To

6    date, C&M has obtained settlement awards on behalf of the JPA claimants from the

7    State Department and FCSC in excess of $50 million.  *Id.*

8    **VI.    The Pan Am Flight 73 Resolution Trust**

9         On June 9, 2009, the Pan Am Flight 73 Resolution Trust (the "Trust") was

10   formed in Washington, D.C. in order, *inter alia*, to hold the receipts from the

11   victims' claims pending distribution.   Newberger Decl. ¶ 19.  The Liaison Group

12   worked with attorneys in D.C. to set up the Trust.  *Id.*  The Declaration of Trust

13   provides that the principal place of administration of the Trust shall be in the

14   District of Columbia.  *Id.*  The Trust holds the funds in high grade government

15   securities, pays expenses, and will ultimately distribute the funds (and any

16   investment proceeds) to the Pan Am Flight 73 victims (*i.e.*, beneficiaries of the

17   Trust).  *Id.* at ¶ 20.  The Trust is governed by D.C. law, and any proceeding relating

18   to the Trust must be venued in federal court in D.C.  *Id.* at ¶ 19.

19        To date, except for those paid on Plaintiff Gargi Davé's claim, all funds

20   recovered – less fees and expenses – have, in fact, been deposited in the Trust

21   account for the benefit of all parties to the JPA, including the Davés.  *Id.* at ¶ 20.

22   In addition, all expenses of the joint prosecution have been paid by the signatories.

23   **VII.   The Davés Refuse To Deposit Funds From The FCSC In The Trust And**
24   **File Suit, Threatening The Interests Of All Other Parties To The JPA**

          On January 4, 2010, without warning to C&M or Liaison Group, Plaintiffs
25
     filed this case in Los Angeles Superior Court seeking declarations that the JPA and
26
     their retention agreements are void and unenforceable, *inter alia*, because they
27
     purportedly conflict with the treaty between the United States and Libya, the LCRA
28

CROWELL
& MORING LLP
ATTORNEYS AT LAW

-8-

DEF. CROWELL & MORING'S MEMO. OF POINTS
AND AUTH. IN SUPPORT OF MOTION TO DISMISS;
CASE NO. CV10-00172 GAF (PLAX)

1   and Executive Order 13477  (*see generally* First Am. Compl. ("FAC")), and also

2   seeking to nullify the arbitration agreement.[2]  Although Plaintiffs name as

3   defendants the Liaison Group -- five JPA signatories over whom this Court may or

4   may not have jurisdiction -- they have made no effort to join the 171 remaining

5   parties who would share in their awards, either the U.S. nationals or the foreign

6   nationals, who appear to be the particular target of the suit.

7        The 178 parties to the JPA live in diverse areas around the world.  At the

8   time of filing of the Second Amended Complaint in the underlying *Patel* litigation,

9   only 22 of the 178 resided in California, while 79 resided outside of the United

10  States.  *See* Newberger Decl. ¶ 35, Ex. F pp. 1-21.

11       Although the far-flung parties to the JPA are unlikely to all be subject to any

12  single district's jurisdiction under traditional personal jurisdiction principles, they

13  solved that problem by agreeing that they would all be subject to jurisdiction in

14  D.C.: "All Parties agree that they shall be subject to the personal jurisdiction of the

15  District of Columbia by the filing of the anticipated civil action in this case." *Id.* at

16  Ex. A ¶ 10.  That action was filed on April 5, 2006, and the claims there are the

17  same claims at issue here.  Newberger Decl. at ¶ 10.  Moreover, the JPA provides

18  for resolution of any disputes between the JPA parties in D.C., first through

19  mediation and then through arbitration:

20            In the event a dispute arises under this Agreement
              between any Parties either regarding the construction and
21

22  [2] By not even hinting of, let alone providing notice of, any grievance or even
    questions, and instead precipitously filing suit, Plaintiffs presumably sought to
23  avoid the mandatory mediation provisions of the JPA and the likelihood that if the
    parties failed to resolve the dispute through mediation, either the Liaison Group or
24  one of the other signatories would, as required, commence arbitration in D.C.  One
    would not expect that type of sneak attack designed to evade a contractual
25  commitment to try to amicably resolve disputes through mediation, and then
    through arbitration, to be readily rewarded.  This is particularly so given the fact
26  that the Davés have actively urged other U.S. nationals to follow them in breaching
    their obligations under the JPA by declining to forward their claim settlement
27  payments to the Trust.  They have done so notwithstanding that the Trust would
    safely hold the funds pending the resolution of any disputes.
28

CROWELL
& MORING LLP
ATTORNEYS AT LAW

-9-

DEF. CROWELL & MORING'S MEMO. OF POINTS
AND AUTH. IN SUPPORT OF MOTION TO DISMISS;
CASE NO. CV10-00172 GAF (PLAX)

1

> enforceability of the Agreement or any actions or disputes
> arising under or in connection with the Agreement, the
> Parties agree that any such disputes shall be submitted for
> confidential arbitration under the provisions of the
> American Arbitration Association ("AAA") and shall be
> venued in the District of Columbia.

2

3

4

*Id.*, Ex. A at ¶ 13. All parties thereby agreed that they would submit to D.C.

5

jurisdiction for disputes about the arbitration clause.

6

Nonetheless, Plaintiffs have filed suit in California, seeking declarations that

7

the JPA is "void" and "unenforceable," particularly as respects distributions to

8

foreign nationals (FAC at ¶ 110), and specifically with respect to its arbitration

9

clause (*id.* at ¶¶ 138-149).

10

## ARGUMENT

11

**I.    Given the Inability to Join Necessary Parties in This Action, The Court Must Determine Whether "In Equity and Good Conscience" the Case Should Proceed or Should Be Dismissed**

12

13

Plaintiffs seek to nullify or avoid the JPA, and specifically its arbitration

14

provision, without joining the more than 170 additional parties to the agreement

15

who have an indisputable interest in the outcome of this action. Under the two-step

16

analysis of Rule 19, the absent parties are clearly necessary because resolution of

17

this action in their absence may "impair or impede" their interests and result in

18

imposition of "multiple, or otherwise inconsistent obligations" on them, as well as

19

on the Liaison Group and C&M, whose interests are bound up in resolution of

20

disputes regarding the JPA. Fed. R. Civ. P. 19(a)(1)(B). Because most of the

21

absent parties reside outside California and even abroad, those necessary parties

22

cannot be joined, and dismissal would therefore be warranted under Rule 19(b).

23

In determining whether and how to proceed in the absence of necessary

24

parties – "in equity and good conscience" per Rule 19 – a practical solution to the

25

non-joinder of the absent parties is available to the Court, and is indeed called for

26

by the JPA itself: transfer this case to the District of Columbia, (a) which all parties,

27

including the absent parties, agreed upon as the situs for dispute resolution; (b)

28

CROWELL
& MORING LLP
ATTORNEYS AT LAW

-10-

DEF. CROWELL & MORING'S MEMO. OF POINTS
AND AUTH. IN SUPPORT OF MOTION TO DISMISS;
CASE NO. CV10-00172 GAF (PLAX)

where any and all parties with a potential interest in this litigation can fairly be asked to elect to participate if they choose; (c) where all the evidence and witnesses are located and (d) which all of the parties, by agreeing to resolve disputes there, have agreed will be convenient.

## II.  Transfer Under 28 U.S.C. § 1404 Is Proper Where It Promotes Convenience and the Interests of Justice

"For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought."  28 U.S.C. § 1404(a).  The provision protects "litigants, witnesses and the public against unnecessary inconvenience and expense." *Van Dusen v. Barrack*, 376 U.S. 612, 616 (1964).

In determining whether to transfer an action under § 1404, courts consider a number of factors, including "the location where the relevant agreements were negotiated and executed"; "the contacts relating to the plaintiff's cause of action in the chosen forum"; and "the ease of access to sources of proof." *Jones v. GNC Franchising, Inc.*, 211 F.3d 495, 498-99 (9th Cir. 2000).  "Additionally, the presence of a forum selection clause is a 'significant factor' in the court's § 1404(a) analysis." *Id. See also Florens Container v. Cho Yang Shipping*, 245 F. Supp. 2d 1086, 1088 (N.D. Cal. 2002).  These factors and others override Plaintiffs' inappropriate choice of forum and justify transfer of this action to the District of Columbia.

### A.  Plaintiffs' Action "Might Have Been Brought" in D.C.

A district court may transfer a case pending before it "to any other district or division where it might have been brought." 28 U.S.C. § 1404(a).  A case "might have been brought" in any court with subject matter jurisdiction, personal jurisdiction over the defendants, and in which there is proper venue. *See Hoffman v. Blaski*, 363 U.S. 335, 343-44 (1960).

The U.S. District Court for the District of Columbia, like this Court, has

CROWELL
& MORING LLP
ATTORNEYS AT LAW

-11-

DEF. CROWELL & MORING'S MEMO. OF POINTS
AND AUTH. IN SUPPORT OF MOTION TO DISMISS;
CASE NO. CV10-00172 GAF (PLAX)

subject matter jurisdiction over this action, because it involves a federal question. 28 U.S.C. § 1331.  Specifically, Plaintiffs plead that "intervention by this Court is required to adjudicate the rights of Plaintiffs to their fair Compensation as defined by federal treaty, executive order, and federal legislation." FAC ¶ 16.  Plaintiffs specifically allege, among other things, that their longstanding and ongoing engagement of C&M has been terminated and rendered void by the "direct[] conflict[] with the CSA, LCRA, and EO [Executive Order]." FAC ¶ 135.  Plaintiffs also use recent federal law to attack and nullify the ongoing JPA:  "Plaintiffs seek declaration by this Court that the federal public policies and intent of the U.S. government underlying and codified by the CSA, EO, and LCRA render the JPA unenforceable by Defendants against Plaintiffs . . . ." FAC ¶ 109.

Personal jurisdiction also lies in D.C.  Crowell & Moring has its main offices in D.C., so it is clearly subject to jurisdiction there.  The members of the Liaison Group have expressly consented in the JPA to adjudication of their disputes in D.C. Newberger Decl, Ex. A at ¶ 10.  And the Liaison Group has recently confirmed their consent to venue in D.C. through the filing of a motion to compel arbitration in the D.C. District Court.  *Id.* at ¶ 38, Ex. G.  *See Fireman's Fund Ins. Co. v. Nat'l Bank of Coops.*, 103 F.3d 888, 893 (9th Cir. 1996) (consent to arbitration in forum conferred personal jurisdiction).  Moreover, all the other signatories to the JPA, whose rights under the agreement are being challenged in this action, have likewise submitted to D.C. jurisdiction both in connection with the arbitration clause and its enforcement, and more generally.  *Id.*, Ex. A at ¶¶ 10, 13; *Doctor's Assocs., Inc. v. Stuart*, 85 F.3d 975, 983 (2d Cir. 1996).

Venue is proper in D.C. because a "substantial part of the events or omissions giving rise to the claim" occurred there.  28 U.S.C. § 1391(b).  "[B]ecause venue is a privilege of the defendant, and venue must be appropriate as to each defendant, the court should generally focus on activities of the defendant and not the activities of plaintiff." *Kelly v. Qualitest Pharm., Inc.*, 2006 WL

CROWELL
& MORING LLP
ATTORNEYS AT LAW

-12-

DEF. CROWELL & MORING'S MEMO. OF POINTS
AND AUTH. IN SUPPORT OF MOTION TO DISMISS;
CASE NO. CV10-00172 GAF (PLAX)

1    2536627, at *8 (E.D. Cal. Aug. 31, 2006).  As demonstrated above, the activities of

2    C&M lawyers, and most of the relevant conduct of the Liaison Group, took place in

3    D.C.  This is more than sufficient to satisfy the requirements of 28 U.S.C. § 1391.

4    *See, e.g., Decker Coal Co. v. Commonwealth Edison Co.*, 805 F.2d 834, 842 (9th

5    Cir. 1986) (venue is proper where contract was to be performed).

6    **B.    Plaintiffs Have Agreed To The District Of Columbia As The
         Venue for Resolution of Any Claims or Disputes**

7            In determining whether to order transfer, "[t]he presence of a forum-selection

8    clause [is] a significant factor that figures centrally in the district court's calculus."

9    *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 29 (1988).  Federal courts "accord

10   forum selection clauses *prima facie* validity."  *Brinderson-Newberg Joint Venture

11   v. Pac. Erectors, Inc.*, 690 F. Supp. 891, 894-95 (C.D. Cal. 1988).  "A party

12   resisting transfer to a forum designated in its contract must demonstrate exceptional

13   facts indicating that transfer would be inappropriate."  *Stonehenge, Ltd. v. Garcia*,

14   989 F. Supp. 539, 541 (S.D.N.Y. 1998) (citation and quotations omitted).  The

15   "venue mandated by a choice of forum clause rarely will be outweighed by other

16   [28 U.S.C. § ] 1404(a) factors."  *RFG Corp. v. Audio Data Video Enters., LLC*,

17   2008 WL 5001382, at *5 (E.D. Cal. Nov. 24, 2008) (citation and quotations

18   omitted).

19           Plaintiffs' claims are subject to a broad forum-selection and arbitration

20   provision, under which Plaintiffs are required to adjudicate their claims in D.C.

21   "An agreement to arbitrate before a specified tribunal is, in effect, a specialized

22   kind of forum-selection clause that posits not only the situs of suit but also the

23   procedure to be used in resolving the dispute."  *Scherk v. Alberto-Culver Co.*, 417

24   U.S. 506, 519 (1974); *Optopics Labs. Corp. v. Nicholas*, 947 F. Supp. 817, 824-25

25   (D. N.J. 1996).  Plaintiffs have agreed to resolve this dispute regarding "the

26   construction and enforceability of the Agreement" in D.C., and only "exceptional

27   facts" can defeat transfer.  No such facts exist.

28

CROWELL
& MORING LLP
ATTORNEYS AT LAW

-13-

DEF. CROWELL & MORING'S MEMO. OF POINTS
AND AUTH. IN SUPPORT OF MOTION TO DISMISS;
CASE NO. CV10-00172 GAF (PLAX)

1   Indeed, Plaintiff's Complaint in this case includes a direct attack on the

2   enforceability of the arbitration clause.  But where the parties agree to arbitrate in a

3   particular venue, they consent to that jurisdiction's power to address the

4   enforceability of the arbitration clause and enforcement of the award determined in

5   that venue. *Cf. Doctor's Assocs., Inc.*, 85 F.3d at 983 ("A party who agrees to

6   arbitrate in a particular jurisdiction consents not only to personal jurisdiction but

7   also to venue of the courts within that jurisdiction."); *Dominium Austin Partners,*

8   *L.L.C. v. Emerson*, 248 F.3d 720, 726 (8th Cir. 2001); *Fireman's Fund*, 103 F.3d at

9   893; 9 U.S.C. §§ 9, 10.

10   Under these circumstances, D.C. must be regarded as the presumptively

11   proper and most convenient forum for resolving the claims in the case, both those

12   that directly challenge the arbitration clause and those that entail the underlying

13   merits.

14   **C.  The Failure And Inability To Join The Other Signatories To The Agreement In This Action Militates Strongly For Transfer To The Jurisdiction Where Absent Parties To The Agreement Can Be Joined And All Parties Agreed To Resolve Their Disputes.**

15   

16   The inability to join all necessary parties to an action in the chosen forum is a

17   consideration that, for obvious reasons, may strongly favor transfer. *See Sierra*

18   *Club v. Leathers*, 754 F.2d 952, 954-55 (11th Cir. 1985).  Indeed, the Court's

19   inability to join necessary parties in this action is grounds for dismissal under

20   Federal Rule of Civil Procedure 19(b).

21   Under Rule 19, the first step in the analysis is to determine whether there are

22   absent parties that are "required to be joined if feasible." Fed. R. Civ. P. 19(a).

23   This condition is met if a person has an interest such that "disposing of the action in

24   the person's absence may":

25   

26   (i) as a practical matter impair or impede the person's ability to protect the interest; or

27   (ii) leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent

28   

CROWELL
& MORING LLP
ATTORNEYS AT LAW

-14-

DEF. CROWELL & MORING'S MEMO. OF POINTS
AND AUTH. IN SUPPORT OF MOTION TO DISMISS;
CASE NO. CV10-00172 GAF (PLAX)

1   obligations because of the interest.

2   Under Rule 19(b), "If a person who is required to be joined if feasible cannot be

3   joined, the court must determine whether, in equity and good conscience, the action

4   should proceed among the existing parties or should be dismissed."

5       Plaintiffs' case at bottom seeks to break apart and nullify an agreement to

6   which the two Plaintiffs and 176 other signatories, are party.[3]   Each of the absent

7   parties, not named by Plaintiffs in the suit, has a direct and immediate interest (a) in

8   the proceeds of the awards that Plaintiffs propose to retain for themselves rather

9   than divide with the other 176 parties to the agreement; (b) in ensuring that

10  Plaintiffs pay their share of the expenses incurred in connection with the suit (and

11  which the remaining 176 would otherwise bear); (c) in continuing the joint

12  representation that the parties agreed would be advantageous to their common

13  objectives; and (d) in enforcing the arbitration provisions that they agreed would be

14  the exclusive mechanism for resolving disputes.  The absent parties thus have a

15  very real and material interest in the resolution of Plaintiffs claims and are

16  necessary parties to this action.  If Plaintiffs were to prevail, it would surely "impair

17  or impede the ability" of the absent parties "to protect [their] interest."  *See* Fed. R.

18  Civ. P. 19(a)(1)(B)(i); *Wilbur v. Locke*, 423 F.3d 1101, 1112 (9th Cir. 2005)

19  (interest in continued viability of contract is type of "legally protected interest" that

20  requires joinder).  Given the focus of Plaintiffs' attack, the foreign nationals would

21  seem to have a very strong and particularized interest in the outcome of Plaintiffs'

22

23

24  _____
        [3] Plaintiffs allege that their recovery from the FCSC is outside the scope of

25  the joint prosecution, and that the JPA (to which C&M is a third-party beneficiary)
    is void and unenforceable, based on claims of fraudulent inducement and violation

26  of federal law.  Based on the same purported misrepresentations and violations of
    federal law, Plaintiffs also seek to rescind their retention agreements, and to hold

27  the Liaison Group and/or C&M liable for fraud and interference with a purported
    contract or prospective economic advantage.  *Compare* FAC, para. 102-20 *with id.*,

28  para. 121-137, 150-224.

1    claims. *See* FAC ¶ 110.[4]

2       Indeed, the Ninth Circuit has recognized that "no procedural principle is

3 more deeply imbedded in the common law than that, in an action to set aside a lease

4 or a contract, all parties who may be affected by the determination of the action are

5 indispensable." *Virginia Sur. Co. v. Northrop Grumman Corp.*, 144 F.3d 1243,

6 1248 (9th Cir. 1998). "[I]t is a fundamental principle that a party to a contract is

7 necessary, and if not susceptible to joinder, indispensable to litigation seeking to

8 decimate that contract." *Wilbur*, 423 F.3d at 1113.[5]

9       To be sure, Plaintiffs have named the five members of the Liaison Group as

10 defendants, purportedly on the theory that they can adequately represent the

11 interests of the other 171 absent parties to the JPA. As a threshold matter, it is not

12 at all clear that the Liaison Group (or its members) can themselves be joined in this

13 action because they all live outside California, and one lives abroad. Beyond that,

14 while the Liaison Group has broad authority under the JPA to act on behalf of the

15 other parties to the JPA, and the Liaison Group and its members undoubtedly will

16 protect and effectuate the JPA, and with it the expressed interests of their fellow

17 Pan Am 73 victims as reflected in the JPA, they cannot be expected to perfectly

18 represent the individual interests of each of the other 171 JPA parties in every

19 respect and on every issue relating to what is at bottom an internal dispute between

20 parties to the JPA. It can easily be imagined that the remaining parties' views on

21 the topics at hand would differ significantly from the Davés' but also not fully align

22

23 [4] "A declaration that the JPA is unenforceable will directly further the federal
policies underlying the interest in fully compensating U.S. victims by preventing
24 the U.S. victims from being forced to share their individual recoveries with non-
U.S. citizens . . . ."

25 [5] The same basic principles apply in state court. *Deltakeeper v. Oakdale Irrigation
26 Dist.*, 94 Cal. App. 4th 1092, 1105-06 (2001) (holding that it "ordinarily is the
case" that "actions involving rights under a contract should include all the parties to
27 the contract").

28

CROWELL
& MORING LLP
ATTORNEYS AT LAW

-16-

DEF. CROWELL & MORING'S MEMO. OF POINTS
AND AUTH. IN SUPPORT OF MOTION TO DISMISS;
CASE NO. CV10-00172 GAF (PLAX)

1    with those of the Liaison Group.  In this context, one cannot presuppose, as

2    Plaintiffs apparently have, that the Liaison Group "will undoubtedly make all of the

3    absent party's arguments." *Shermoen v. United States*, 982 F.2d 1312, 1318 (9th

4    Cir. 1992).

5        Indeed, in actions to dissolve a contract, the disparate interests implicated

6    render participation by a mere handful of signatories unsatisfactory, because the

7    other parties add a necessary element to the proceedings.  As the 9th Circuit stated

8    in *Wilbur*, 423 F.3d at 1113-14:

9          Under the [plaintiffs'] logic, one seeking to nullify an agreement

10   could simply sue one of the signatories and then argue that the
     remaining signatories were not necessary because the existing

11   defendant would "adequately represent" their interest in
     defending the contract.  However, the general rule is exactly the

12   opposite: all parties to a contract are necessary in litigation

13   seeking to "decimate" that contract.

14   *See also Makah Indian Tribe v. Verity*, 910 F.2d 555, 558-60 (9th Cir. 1990)

15   (holding that, in action to adjust fishing rights of Indian tribes, "the absent tribes

16   had no proper representative because potential intertribal conflicts meant the United

17   States could not represent all of them"); *Hansen v. Peoples Bank of Bloomington*,

18   594 F.2d 1149, 1153 (7th Cir. 1979).

19       As "managing agent," the Liaison Group enjoys broad authority to manage,

20   coordinate and oversee the conduct of the claims prosecution and "to act on behalf

21   of the Parties in any manner necessary to prosecute their interests" (*see* JPA ¶¶ 6,

22   7).  But there is a fundamental difference between allowing the Liaison Group to

23   pursue certain claims against third parties, and using the Liaison Group to stand in

24   for the absent parties as a *defendant* in an internal dispute.

25       Given the many absent parties whose interest in this dispute cannot be fully

26   represented by the named parties, it is quite clear that they are necessary parties—

27   *i.e.,* parties who should be joined if feasible under Rule 19(a).  Yet it is also clear

28   that few of the absent parties could plausibly be joined in this district because most

CROWELL
& MORING LLP
ATTORNEYS AT LAW

-17-

DEF. CROWELL & MORING'S MEMO. OF POINTS
AND AUTH. IN SUPPORT OF MOTION TO DISMISS;
CASE NO. CV10-00172 GAF (PLAX)

1   reside outside California and many live abroad.[6]  Given this fact, the Court must

2   determine whether, "in equity or good conscience," the action should proceed

3   without the absent parties or should be dismissed.  Fed. R. Civ. P. 19(b).  In making

4   this determination, the Court must "focus on the practical effects of joinder and

5   nonjoinder." *Eldredge v. Carpenters 46 N. Cal. Counties Joint Apprenticeship and*

6   *Training Comm.*, 662 F.2d 534, 537 (9th Cir. 1981).  Having determined that a

7   party should be joined if feasible, the court must take a flexible, pragmatic and

8   case-specific approach in determining how best to protect the interests of justice

9   and those affected by the court's judgment:

10          [T]he determination whether to proceed will turn upon
               factors that are case specific, which is consistent with a
11          Rule based on equitable considerations. This is also
               consistent with the fact that the determination of who
12          may, or must, be parties to a suit has consequences for the
               persons and entities affected by the judgment; for the
13          judicial system and its interest in the integrity of its
               processes and the respect accorded to its decrees; and for
14          society and its concern for the fair and prompt resolution
               of disputes. For these reasons, the issue of joinder can be
15          complex, and determinations are case specific.

16   *Republic of Philippines v. Pimentel*,__ U.S. __, 128 S.Ct. 2180, 2188 (2008).

17          Here, the court must determine how to protect the interests of 178 parties to a

18   contract, recognizing the inherent difficulties and burdens in litigation that involves

19   so many people.  Because Plaintiffs seek to void the JPA, limiting relief to avoid

20   prejudicing the absent parties is not an option.  *See Wilbur*, 423 F.3d at 1114.  It is

21   not our suggestion, moreover, that all 178 parties to the JPA have to be served and

22   named as defendants in connection with each and every dispute that might arise

23   under the agreement.  To the contrary, requiring 178 distant parties to appear in the

24   _____

25   [6] Joinder of the other parties to the JPA is not feasible because the vast majority are
       not subject to jurisdiction in California. *See Sierra Club*, 754 F.2d at 954-55.  Only
26   22 of the parties to the JPA, including Plaintiffs, reside in California, and 79 reside
       outside of the United States.  Newberger Decl., Ex. F pp. 1-21.
27

28

1   litigation here or elsewhere would obviously be counterproductive and burdensome

2   – perhaps undermining, rather than protecting their interests, and imposing burdens

3   on them that they would almost certainly wish to avoid.  On the other hand, one

4   cannot simply ignore their interests; indeed, even if they were satisfied now to let

5   the case proceed as structured, as matters developed they might determine that they

6   have a role to play.  They ought not be forced to come to California, a jurisdiction

7   foreign to them, in order to vindicate their rights and interests.

8       The most pragmatic path forward is the one set out by the parties

9   themselves in the JPA.  Foreseeing the practical difficulties in trying to resolve

10   contract disputes among and between 178 parties, they provided for a reasonable

11   method for overcoming those difficulties.  They consented to mediation and

12   arbitration in D.C., thereby consenting to jurisdiction for proceedings related to

13   arbitration.  Newberger Decl., Ex. A at ¶¶ 13-14; *Doctor's Assocs.*, 85 F.3d at 979,

14   983; *Dominium Austin Partners, L.L.C.*, 248 F.3d at 726; *Fireman's Fund*, 103 F.3d

15   at 893.  They also consented generally to jurisdiction in D.C. upon the initiation of

16   the underlying *Patel* litigation.  Newberger Decl., Ex. A at ¶ 10.

17       Thus, the interests of the absent parties and those of the Davés can

18   appropriately be accommodated in D.C., where all of the potentially interested

19   parties can intervene and participate as they deem appropriate (or could even be

20   joined, if for some reason it proved vital to do so).[7]  If the case is to continue in a

21   courtroom as a fight over arbitration or even a fight on the merits, all parties may

22   appropriately be asked to join in the fight there if they so choose.  If it ends up in

23   arbitration, then that is exactly what the parties have agreed to do.

24       In fact, the Liaison Group has already moved to compel arbitration in the

25

26   _____

    [7] Indeed, Plaintiffs have asserted in their opposition to the Liaison Group's
27  motion to compel arbitration in the District Court for the District of Columbia that,
    under the arbitration provision in the JPA, all signatories would participate in
28  arbitration.  (*See* Newberger Decl. Ex. G at 12.)

CROWELL
& MORING LLP
ATTORNEYS AT LAW
                                    -19-          DEF. CROWELL & MORING'S MEMO. OF POINTS
                                                  AND AUTH. IN SUPPORT OF MOTION TO DISMISS;
                                                  CASE NO. CV10-00172 GAF (PLAX)

1    District Court for the District of Columbia.  Newberger Decl. ¶ 38.  Under the

2    Federal Arbitration Act, that court is the only court that can order arbitration in

3    D.C., as the parties themselves agreed – and it was certainly proper to bring the

4    action there.  *See* 9 U.S.C. § 4; *Textile Unlimited, Inc. v. A..BMH & Co.*, 240 F.3d

5    781, 785 (9th Cir. 2001) ("§ 4 . . . confines the arbitration to the district in which

6    the petition to compel is filed"); *QAI, Inc. v. Sprint Comms. Co.*, 120 F. Supp. 2d

7    1218, 1222 (C.D. Cal. 2000); *Optopics Labs. Corp.*, 947 F. Supp. at 824-25

8    (transferring action to district that could compel arbitration in parties' chosen

9    forum).

10        While the interests of the absent parties themselves are of primary

11    importance, the strong interests of the already joined defendants in either dismissal

12    or transfer is also properly considered.  *See* Fed. R. Civ. P. 19(a)(1)(B)(ii).  If the

13    Davés can proceed with a separate litigation against the Liaison Group without

14    joining the other signatories, then so can every other party, and the possibility of

15    multiple litigations, rather than a single proceeding resolving any and all disputes,

16    becomes very real.  Both the Liaison Group and C&M have a very real interest in

17    not being subjected to multiple suits (or arbitrations) concerning the same subject

18    matter, especially where they all clearly arise from a basic, fundamental,

19    contractual relationship.  The possibility of multiple suits certainly raises the

20    possibility not only of multiple, and therefore, wasteful proceedings, but could

21    severely drain the Trust of its resources – to the detriment of all of the parties.  And

22    it raises the spectre of inconsistent decisions, or even inconsistent judgments and

23    ongoing obligations (since this is a continuing contract), on precisely the same

24    subject matter.  That too is a circumstance to be avoided.  *Id.*

25        Therefore, in light of the availability of the D.C. forum, the interests of the

26    absent parties, and the inability to shape relief to protect those interests, this case

27    should be dismissed for failure to join necessary parties who cannot be joined in

28    this district or, in the alternative, transferred to the U.S. District Court for the

CROWELL
& MORING LLP
ATTORNEYS AT LAW

-20-

DEF. CROWELL & MORING'S MEMO. OF POINTS
AND AUTH. IN SUPPORT OF MOTION TO DISMISS;
CASE NO. CV10-00172 GAF (PLAX)

1    District of Columbia.

2    **D.    Practical Considerations Of Convenience And The Interests Of
        Justice Support Transfer**

3
        **1.    The Events At Issue Took Place Primarily In D.C.**

4        The genesis of the case was the D.C.-based prosecution of the leader of the

5    Pan Am hijacking, the evolution of a group seeking to take action, and the contact

6    they made with C&M in D.C. to consider the factual and legal bases of any

7    potential claims against Libya and its officials in U.S. courts.  The JPA was largely

8    conceived and reduced to final writing, in D.C.  Newberger Decl. ¶ 5.  It is

9    governed by D.C. law.  *Id.*, Ex. A at ¶ 10.  Likewise, the retention agreements were

10   drafted in D.C., address proceedings to be prosecuted in D.C., and are covered by

11   D.C. law.

12       When the members of the Liaison Group meet, they meet in Washington,

13   D.C, and they have maintained contact with C&M through its D.C. office.

14   Newberger Decl. ¶ 7.

15       The Trust that was created to hold any funds recovered on behalf the victims

16   was also conceived, and the documents drafted, in D.C.  *Id.* at ¶ 19.  The principal

17   place of administration of the Trust is Washington, D.C.  *Id.*  The Declaration of

18   Trust is governed by D.C. law, and D.C. was selected as the forum for "[a]ny . . .

19   action arising out of" the Declaration.  *Id.*

20       Performance under the JPA and retention agreements also took place in

21   D.C.  The investigation of the Pan Am victims' claims was coordinated from

22   C&M's D.C. office.  *Id.* at ¶ 9.  D.C.-based C&M attorneys and staff logged over

23   12,000 hours investigating and preparing claims on behalf of the Pan Am victims,

24   including Plaintiffs.  *Id.* at ¶ 21.  Experts who assisted with this analysis reside in or

25   near D.C.  *Id.* at ¶ 8.

26       The *Patel* complaint was drafted and then filed in the D.C. District Court,

27   where nearly two years of litigation took place.  *Id.* at ¶ 10.  With the Government's

28

CROWELL
& MORING LLP
ATTORNEYS AT LAW

-21-

DEF. CROWELL & MORING'S MEMO. OF POINTS
AND AUTH. IN SUPPORT OF MOTION TO DISMISS;
CASE NO. CV10-00172 GAF (PLAX)

1   global settlement, all transition consultations between the State Department and

2   C&M concerning a fair formula to apply to the Pan Am 73 (and other) claims took

3   place in D.C. *Id.* at ¶ 15. All the work that was done for submission of claims to

4   the State Department and FCSC, including hearings and appeals, have taken place

5   in D.C. *Id.* at ¶ 18.

6             **2.     Relevant Materials and Witnesses Are Located In D.C.**

7             The convenience of witnesses is another important factor supporting transfer

8   to D.C. *Fontaine v. Wash. Mut. Bank, Inc.*, 2009 WL 1202886, at *3 (C.D. Cal.

9   April 30, 2009).

10            Plaintiff seeks to nullify the JPA and the C&M retention agreements on a

11  variety of grounds: that they were induced by fraudulent or negligent

12  misrepresentations by C&M and the Liaison Group; that C&M breached the

13  retention agreement; and that both C&M and the Liaison Group breached their

14  fiduciary obligations to Plaintiffs. FAC, Fourth-Seventh Causes of Action.   In

15  order to adjudicate these claims, a trier of fact must understand the drafting and

16  purpose of the JPA and the retention agreements, the nature of the work provided

17  by C&M pursuant to those agreements, the relationship between Plaintiffs and

18  Defendants, the relationship between C&M's work and Plaintiffs' recovery from

19  the FCSC, and the process for establishing and paying claims to victims. Materials

20  and witnesses related to all of these topics are located in or near D.C., including

21  C&M lawyers who practice in D.C. and reside in the Washington, D.C. area.

22  Newberger Decl. ¶¶ 21-33.

23            A review of C&M's time records reflects that 49 attorneys have been

24  involved in this matter over time. All but two of those attorneys practice in

25  Washington, D.C. and reside in that area. C&M attorneys and staff have devoted

26  over 12,000 hours of time to the matter. *Id.* at ¶ 21. Although not all of these

27  attorneys will testify, many of them would offer critical testimony on the

28  relationship and nature of the claims, the value of the case, the advantages of the

CROWELL
& MORING LLP
ATTORNEYS AT LAW

-22-

DEF. CROWELL & MORING'S MEMO. OF POINTS
AND AUTH. IN SUPPORT OF MOTION TO DISMISS;
CASE NO. CV10-00172 GAF (PLAX)

1    joint representation, Libya's litigation practices, and the many communications

2    with the Davés, the Liaison Group, and other parties to the JPA, all issues that are

3    central to Plaintiffs' complaint.  Newberger Decl. ¶¶ 21-33.

4            Similarly, Plaintiffs allege that the JPA and retention agreement should be

5    invalidated because they conflict with federal law and treaties, including the LCRA,

6    EO 13477, the Claim Settlement Agreement with Libya, and the FCSC statute.

7    FAC, First-Third Causes of Action.  Plaintiffs further allege that defendants

8    tortiously interfered with the "contracts" and "prospective economic advantages"

9    created by the LCRA, EO and CSA.  FAC, Eighth-Ninth Causes of Action.  All of

10   these allegations go to actions of government officials and C&M attorneys who are

11   located in Washington, D.C. and the intended impact and purpose of the LCRA and

12   the laws governing the FCSC.   The C&M attorneys who participated in the claims

13   resolution process and who allegedly interfered with Plaintiffs' receipt of benefits

14   under the "contracts" created by statute and treaty, are all located in Washington,

15   D.C. Id.

16           In their TRO papers filed with this Court, Plaintiffs have suggested that State

17   Department officials Jonathan Schwartz and David Welch are knowledgeable

18   regarding the negotiation of the CSA with Libya and application of that treaty and

19   the LCRA to disposition of the Libya settlement fund.[8]  To the extent that anyone

20   could persuade these and other State Department to testify, all of those third party

21   witnesses – including Messrs. Schwartz and Welch and Linda Jacobson –  are to be

22   found at the State Department in Washington, D.C. (as their place of business) or in

23   their residences nearby. See id. at ¶ 33.

24           Finally, it is clear that, at a minimum, many other signatories to the JPA will

25   be witnesses to the relevant events.  Although many live outside of D.C., each has

26   _____

27   [8] Memorandum of Points and Authorities in Support of Plaintiffs' Motion for
     Temporary Restraining Order and Preliminary Injunction or in the Alternative a
     Stay of Parallel Litigation, Ex. E, Alford Declaration ¶¶ 6-7.

28

CROWELL
& MORING LLP
ATTORNEYS AT LAW

-23-

DEF. CROWELL & MORING'S MEMO. OF POINTS
AND AUTH. IN SUPPORT OF MOTION TO DISMISS;
CASE NO. CV10-00172 GAF (PLAX)

1   effectively acknowledged in the JPA (and by filing suit in D.C.) that they would be

2   willing to come to D.C. in connection with the dispute.  Plaintiffs themselves

3   cannot be heard to object to appearing for hearings in D.C., where they agreed to

4   resolve their disputes.  Newberger Decl. ¶¶ 33, 37; Ex. A at ¶¶ 13, 14.

5      **3. Plaintiffs' Choice Of Forum Is Entitled To Little Weight**

6     Plaintiffs' choice to file suit in California cannot outweigh the factors

7   supporting transfer.  "If the operative facts have not occurred within the forum of

8   original selection and that forum has no particular interest in the parties or the

9   subject matter, the plaintiff's choice is only entitled to minimal consideration."

10  *Florens Container*, 245 F. Supp. 2d at 1092 (citations and quotations omitted); *see*

11  *also IBM Credit Corp. v. Definitive Computer Servs., Inc.*, 1996 WL 101172, at *2

12  (N.D. Cal. Feb. 28, 1996).  That Plaintiffs reside in California is insufficient to

13  support their choice to litigate here.

14    In addition, Plaintiffs' agreement to adjudicate issues regarding the JPA in

15  D.C. undercuts any interest they have in litigating in California.  *See, e.g.*, *Jumara*

16  *v. State Farm Ins. Co.*, 55 F.3d 873, 880 (3d Cir. 1995) ("[W]hile courts normally

17  defer to a plaintiff's choice of forum, such deference is inappropriate where the

18  plaintiff has already freely contractually chosen an appropriate venue."); *Optopics*

19  *Labs. Corp.*, 947 F. Supp. at 825 ("[A]rbitration clauses are manifestations of the

20  parties' preferences as to a convenient forum."); *Unisys Corp. v. Access Co., Ltd.*,

21  2005 WL 3157457, at *4-5 (N.D. Cal. Nov. 23, 2005) ("A forum selection clause is

22  determinative of the convenience to the parties."); *In re Ricoh Corp.*, 870 F.2d 570,

23  573 (11th Cir. 1989) (given forum selection clause, "we see no reason why a court

24  should accord deference to the forum in which the plaintiff filed its action.").

25     **4. The Interests Of Justice Support Transfer to D.C.**

26    The interests of justice are plainly advanced by transferring this case because,

27  first, transfer would enforce the agreement of the 178 parties to the JPA to

28  adjudicate—indeed arbitrate—their disputes in D.C.  *See Optopics Labs. Corp.*, 947

CROWELL
& MORING LLP
ATTORNEYS AT LAW

-24-

DEF. CROWELL & MORING'S MEMO. OF POINTS
AND AUTH. IN SUPPORT OF MOTION TO DISMISS;
CASE NO. CV10-00172 GAF (PLAX)

1    F. Supp. at 824-25; *Van Dusen*, 376 U.S. at 616.

2        Second, the "local interest in deciding local controversies at home" supports

3    transfer. *Optopics Labs. Corp.*, 947 F. Supp. at 825.  This dispute arises from the

4    claims procedures established by the U.S. government for the victims of Libyan-

5    backed terrorism.  This is an area in which D.C.-based administrative bodies,

6    including the Departments of State and Treasury, have heavy involvement.  The

7    federal government has determined that the claims process for victims should take

8    place before the FCSC in D.C.  Newberger Decl. ¶ 17.

9        Third, the ability of the District Court for the District of Columbia to compel

10    arbitration of those claims in the forum chosen by the parties to the JPA strongly

11    supports transfer. *Optopics Labs. Corp.*, 947 F. Supp. at 826.

12                    **CONCLUSION**

13        For the foregoing reasons, Defendant Crowell & Moring LLP's motion

14    should be granted, and this action should be dismissed or transferred to the United

15    States District Court for the District of Columbia.

16    Dated:     February 12, 2010           Crowell & Moring LLP

17

18                             */s/*     *Nathanial J. Wood*

19                               Nathanial J. Wood

20                               Attorneys for Defendant
                                   Crowell & Moring LLP

21

22

23

24

25

26

27

28