JS - 6          **LINK: 8**

# UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| GARGI DAVÉ and GIATRI DAVÉ,<br><br>        Plaintiffs,<br><br>    vs.<br><br>CROWELL & MORING LLP, and the<br>PAN AM FLIGHT 73 LIAISON<br>GROUP,<br><br>        Defendants. | **Case No. CV 10-0172 GAF (PLAx)**<br><br>MEMORANDUM & ORDER<br>REGARDING PLAINTIFFS' MOTION TO<br>REMAND |

## I.

## INTRODUCTION

On September 5, 1986, Libyan terrorists hijacked Pan Am Airlines Flight 73 in Karachi, Pakistan as some 380 passengers were boarding the aircraft for a flight to Frankfurt, Germany.  When Pakistani security forces stormed the aircraft, the hijackers turned their weapons on the passengers, killing 20 and injuring another 120 before they were subdued and taken into custody.  While the majority of passengers were non-U.S. nationals, Plaintiffs Gargi and Giatri Davé, both of whom are United States citizens, were on the aircraft and suffered serious injuries in the gun battle.

Over the next 20 years, Plaintiffs received no compensation for their injuries.  Then, in 2005, Defendant Crowell & Moring, LLP ("Crowell & Moring") formed the Pan Am Flight 73 Liaison Group (the "Liaison Group") to bring suit against the Libyans and seek damages for the victims of the hijacking.  The Plaintiffs joined the Liaison

Group and signed two agreements—the Joint Prosecution Agreement ("JPA"), which governs the relationship among group members, and a retainer agreement (the "C&M Retainer") naming Crowell & Moring as counsel for the group members and authorizing the firm to act on their behalf.  Under the JPA, the group members (43 U.S. nationals and 143 non-U.S. nationals) would equally share the proceeds of any recovery that Crowell and Moring obtained for any JPA signatory.  For their services, Crowell & Moring would receive a fee in the form of a percentage of any recovery obtained on behalf of its clients.

In 2006, Crowell & Moring filed a lawsuit against Libya on behalf of approximately 186 plaintiffs.  However, developments in United States/Libyan relations outpaced the progress of the lawsuit.  Before any recovery was obtained through the litigation, the United States and Libya normalized relations and entered into a bilateral settlement agreement, which included a comprehensive settlement of all U.S. nationals' terrorism-related claims.  Upon the announcement of the U.S.-Libya agreement, Crowell & Moring and the Liaison Group dismissed the lawsuit brought on behalf of the parties to the JPA, even though the U.S.-Libya agreement provided for no recovery for non-U.S. nationals.  In the meantime, the Foreign Settlement Claims Commission, an organization within the Department of Justice, awarded Gargi Davé $3 million in damages through proceedings in which Crowell & Moring was not involved.  Even so, Crowell & Moring, upon learning of the recovery, contacted Plaintiff and notified her that she should deposit her $3 million payment in the Crowell & Moring client escrow account so that the proceeds could be distributed in accordance with the JPA and C&M Retainer.  Plaintiffs have refused to acquiesce in this demand because Crowell & Moring had no role in Gargi Davé's recovery.

Crowell & Moring's demand and the Plaintiffs' response have given rise to this lawsuit, which is essentially a breach of contract action to determine whether the JPA and C&M Retainer can be construed to encompass damage awards that were not recovered through the litigation activities of Crowell & Moring.  Rather than wait for

Crowell & Moring to bring suit, Plaintiffs filed a declaratory relief action in Los Angeles County Superior Court.  In the lawsuit, Plaintiffs seek a determination that the JPA and the C&M Retainer do not give any rights to Crowell & Moring or Liaison Group members in recoveries obtained through means other than Crowell & Moring's actions on behalf of the members of the JPA.  Plaintiffs also sue for breach of contract, interference with contract and interference with prospective economic advantage.  Most notably for present purposes, the pending complaint raises several federal defenses to Crowell & Moring's potential breach of contract action.[1]

Based on the federal issues identified in the complaint, Crowell & Moring removed this lawsuit to federal court in a petition asserting that this Court has federal question jurisdiction over the dispute.  In support of its removal, Crowell & Moring contends that Plaintiffs' first three declaratory relief claims—those attacking the enforceability of the JPA, the C&M Retainer, and the JPA arbitration provision—seek to use federal law to invalidate the contractual agreements, and thus implicitly constitute affirmative federal claims.  Crowell & Moring further contends that the three remaining claims for breach of contract, intentional interference with contract, and intentional interference with prospective economic advantage each necessarily raises an important federal question that must be resolved as a condition to the resolution of the dispute. Plaintiff now moves to remand.

The Court concludes that the case should be remanded to state court.  The declaratory relief claims at issue arise under state law even though they may anticipate federal defenses.  In essence, those claims present the same issues that the Court would confront had Crowell & Moring brought a coercive action to *enforce* the provisions of the JPA and the C&M Retainer.  Any such action would arise under state law, and could not be brought in federal court even where a federal defense would be raised against

---

[1]The complaint also includes claims for breach of fiduciary duty, fraudulent misrepresentation, and negligent misrepresentation.  Crowell & Moring concedes that these claims arise under state law and present no federal question.

those claims.  In this context,  <u>Skelly Oil v. Phillips Petroleum Co.</u>, 339 U.S. 667 (1950) and controlling Ninth Circuit authority hold that Plaintiffs' claims cannot be characterized as affirmative federal claims and do not raise a federal question merely because the position of the parties in relationship to the "v." in the caption is reversed. Thus, the exercise of federal jurisdiction in this declaratory relief action, based on anticipated federal defenses to garden variety state law tort and contract claims, would improperly extend the Court's jurisdiction in violation of the rule announced in <u>Skelly Oil</u>.

The remaining three claims also fall outside this Court's federal question jurisdiction.   The merits of Plaintiffs' breach of contract claim can be determined by looking strictly at the JPA and whether Defendants complied with the contract's terms; no analysis of federal law is necessary.  Further, the interference with economic advantage claim raises no dispute over a substantial federal question because both parties agree that the U.S.-Libya Claims Settlement Agreement, the Libyan Claims Resolution Act, and the related Executive Order provide Plaintiffs with some form of settlement award in the first instance.  In short, the only federal issue—Plaintiffs right to recover under the settlement—is not in dispute.  The only question is whether, under state law, Crowell & Moring's effort to lay claim to that recovery constitutes an improper interference with the right to recover.  Finally, Plaintiffs' interference with contract claim likewise fails to raise a substantial federal question.  Because Plaintiff cannot establish any private right to bring suit in domestic courts to enforce any rights they may have under the treaty, the claim is without any substantial basis under federal law and cannot give rise to federal question jurisdiction in this case.  <u>See</u> <u>Medellin v. Texas</u>, 552 U.S. 491, 506 (2008).

For these reasons, which are explained in greater detail below, Plaintiffs' motion to remand is **GRANTED**.

## II.

## BACKGROUND

### A. FACTUAL HISTORY

On September 5, 1986, a Pan Am Airlines flight carrying approximately 380 passengers was hijacked by Libyan terrorists in Karachi, Pakistan, leaving 20 passengers dead and over 120 wounded (the "Pan Am Hijacking").[2]  (First Am. Compl. ("FAC") ¶ 1; Newberger Decl. ¶ 7.)  Plaintiffs Gargi Davé and Giatri Davé, who are sisters, were children at the time of the hijacking.  (FAC ¶ 2.)  Both were "held hostage, fired upon by grenades and automatic weapons fire, and were severely wounded."  (Id.)  Gargi sustained severe head injuries, leaving her in a coma for several days and hospitalized for months thereafter.  (Id. ¶ 32.)  Giatri also sustained severe injuries and required months of hospitalization.  (Id. ¶ 33.)

### 1. THE LIAISON GROUP AND THE JOINT PROSECUTION AGREEMENT

In October 2004, Plaintiffs received a letter indicating that certain individuals had voluntarily formed a Liaison Group consisting of survivors of the Pan Am Hijacking and/or their heirs.  (Id. ¶¶ 49-50.)  The letter stated that the Liaison Group,[3] through Crowell & Moring,[4] sought to represent Plaintiffs in a civil suit against Libya for the Pan Am Hijacking.  (Id. ¶ 53.)  The Liaison Group was to serve as a representative of the victims of the Pan Am Hijacking and as the entity authorized to act as liaison with litigation counsel.  (Id. ¶ 52.)  The Liaison Group stated that in order to

---

[2]Of the passengers killed, two were United States citizens and eighteen were foreign nationals. (Newberger Decl. ¶ 9.)

[3]Plaintiffs allege that the Liaison Group was represented by Latham & Watkins, LLP ("Latham & Watkins"). (FAC ¶ 51.) Crowell & Moring and the Liaison Group allegedly retained Latham & Watkins for the purpose of establishing a trust, the Pan Am 73 Resolution Trust, which would hold all funds awarded to U.S. nationals.  (Id.)  Latham & Watkins serves as the trust's legal counsel.  (Id.)

[4]In Summer 2004, victims of the Pan Am Hijacking contacted Crowell & Moring regarding the possibility of pursuing a claim against Libya to obtain compensation for all of the victims and their families. (Newberger Decl. ¶¶ 11-12.) At the time the victims approached Crowell & Moring, the firm had been involved in pursuing terrorism-related claims against both Iran and Libya.  (Id. ¶ 13.)

join in the suit against Libya, Plaintiffs were required to sign a Joint Prosecution Agreement.[5]  (Id. ¶ 56.)  However, Plaintiffs allege that the Liaison Group failed to disclose that the vast majority of the victims of the Pan Am Hijacking were non-U.S. nationals and that four of the five individuals who formed the Liaison Group were also non-U.S. nationals.  (Id. ¶¶ 58, 59.)  Likewise, the JPA allegedly did not mention the possibility that group members might receive a recovery for terrorist-related injuries as a result of the U.S. government's diplomatic efforts.  (Id. ¶ 64.)  Nor did the Liaison Group disclose that the chances that non-U.S. nationals recovering under a U.S.-negotiated settlement were "virtually nil."  (Id. ¶ 60.)  The JPA's terms only "cover, relate to, and anticipate" a civil lawsuit to be filed against Libya.  (Id.)

According to Crowell & Moring's records, Gargi Davé signed a joinder to become a party to the JPA on February 25, 2005.  (Newberger Decl., Ex. B.)  Giatri Davé signed her joinder on July 14, 2005.  (Id., Ex. C.)

### 2.  CROWELL & MORING RETAINER AGREEMENT

The Crowell & Moring Retainer Agreement incorporated the JPA and stated that "any recovery [from civil lawsuit] will be distributed in accordance with the terms of the JPA."  (FAC ¶ 67.)  The retainer agreement indicated that the Liaison Group was to be "responsible for helping to manage and oversee the direction of the case" and had "authority to act for the entire Pan Am 73 collection of victims and families."  (Id. ¶ 52.)  Crowell & Moring would represent all victims of the Pan Am Hijacking who signed the JPA.  (Id. ¶ 68.)  The agreement further stated that "[b]y joining into the JPA, you agree to waive any potential conflicts regarding the law firm's joint representation of you and the other Pan Am 73 victims and families.  As noted in the JPA, we do not foresee any such conflicts at this time." (Id. ¶ 70.)

---

[5]The JPA states: "Given the random nature of the Pan Am 73 attack, the Liaison Committee (LC) agreed upon the distribution formula below, which will apply to all victims regardless of age, gender, marital status, number of family members, nationality or national origin."  (Newberger Decl., Ex. A [JPA ¶ 5].) The JPA applies to "any further financial recovery against the Defendants responsible for the Pan Am 73 attack, (whether by settlement, judgment or payment from any source) . . . ."  (Id. [¶ 4].)

### 3. LAWSUIT AGAINST LIBYA

In April 2006, Crowell & Moring filed a complaint in Washington, D.C. on behalf of 157 plaintiffs, 42 of whom were U.S. nationals and 115 of whom were non-U.S. nationals, naming Libya and Mohammar Qaddafhi as defendants.  (Id. ¶ 74.)  The lawsuit was later amended to add 28 additional non-U.S. plaintiffs.[6]  (Id.)

### 4. GLOBAL SETTLEMENT OF TERRORISM-RELATED CLAIMS AGAINST LIBYA

Weeks after Crowell & Moring filed its suit against Libya on behalf of the parties to the JPA, the Liaison Group notified Plaintiffs that the United States had decided to restore full diplomatic relations with Libya.  (Id. ¶ 77.)  The Liaison Group further stated that "this would have no impact on the case with regard to moving forward" and that this restoration was anticipated.  (Id.)  In mid-2008, the Liaison Group emailed Plaintiffs stating that Libya was entering into talks with the United States for a comprehensive settlement of all claims related to terrorism.  (Id. ¶ 78.)  According to Plaintiffs, Defendants never stated that they had any role in the diplomatic efforts on Plaintiffs' behalf.  (Id. ¶ 80.)

#### a. *Libyan Claims Resolution Act*

On August 4, 2008, Congress approved the Libyan Claims Resolution Act, Public Law 110-301 ("LCRA"), which set forth Congress's intent to support the President in "his efforts to provide fair compensation to all nationals of the United States who have terrorism-related claims against Libya through a comprehensive settlement of claims by such nationals against Libya pursuant to an international agreement between the United States and Libya as a part of the process of restoring normal relations between Libya and the U.S."  (Id. ¶¶ 81-82; see also Libyan Claims Resolution Act, Pub. L. No. 110-301, § 3, 122 Stat. 2999 (2008) ("LCRA").)  The LCRA authorized the Secretary of State to designate one or more entities to provide

---

[6]The terms of the JPA permitted the addition of non-U.S. nationals to the agreement.  (Id. ¶ 65.)

compensation to U.S. nationals involved in the Pan Am Hijacking, pursuant to a claims agreement.  (Id. ¶ 83; see also LCRA § 4.)

### b. Claims Settlement Agreement

On August 14, 2008, the United States and Libya executed a Claims Settlement Agreement ("CSA"), settling all claims of victims of terrorism, regardless of whether the claim was represented in a lawsuit.  (Id. ¶ 84.)  The CSA established a settlement fund for settling and terminating all claims, and stated that no funds would be distributed until a specific claimant had terminated any pending suit.  (Id. ¶¶ 87, 89.) The CSA dictated that each nation would accept resources from the settlement fund as a full and final settlement of its claims and the suits of its nationals.  (Id. ¶ 88.)  Of the settlement fund's $1.5 billion, the funds were to be first allocated to victims of two other acts of Libyan terrorism—the bombings of Pam Am Flight 103 ("Lockerbie") and the LaBelle Discotheque.  (See Newberger Decl. ¶ 63.)  The remaining funds were to be distributed to claimants in specifically identified incidents, including the Pan Am Hijacking.  (Id.)

### c. Executive Order 13477 and the Foreign Claims Settlement Commission

On October 31, 2008, the President of the United States issued Executive Order 13477, Settlement of Claims Against Libya (the "Executive Order"), which ordered all claims of U.S. nationals against Libya settled according to the terms of the CSA.  (FAC ¶ 90; Exec. Order 13,477, 73 Fed. Reg. 65,965 (Oct. 31, 2008) ("Claims of United States nationals within the terms of Article I [of the Claims Settlement Agreement] are espoused by the United States and are settled according to the terms of the Claims Settlement Agreement.").)  Assistant Secretary of State C. David Welch indicated that non-U.S. nationals who were victims of Libyan terrorism would not be covered by the CSA and instead would need to seek remedies through their own governments.  (Id. ¶ 91.)

On January 15, 2009, under the authority of the Secretary of State under 22 U.S.C. § 1623(a)(1)(C), the Department of State Legal Advisor referred to the Foreign Claims Settlement Commission (the "Commission") various claims of U.S. nationals against Libya. (Id. ¶ 92.)  The Commission is a "quasi-judicial, independent agency within the Department of Justice which adjudicates claims of U.S. nationals against foreign governments, under specific jurisdiction conferred by Congress, pursuant to international claims settlement agreements, or at the request of the Secretary of State." (Id. ¶ 93.)  Under 22 U.S.C. § 1623(f), "[n]o remuneration on account of services rendered on behalf of any claimant in connection with any claim filed with the Commission under this subchapter shall exceed 10 per centum of the total amount paid pursuant to any award certified under the provisions of this subchapter on account of such claim.  Any agreement to the contrary shall be unlawful and void."  (Id. ¶ 94.)

### 5. DISMISSAL OF THE LAWSUIT

Upon the announcement of the U.S.-Libya agreement, Crowell & Moring and the Liaison Group dismissed the lawsuit that they had filed on behalf of the parties to the JPA.  (Id. ¶ 6.)  The Defendants had not secured any recovery or compensation on behalf of Plaintiffs or any of the signatories to the JPA.  (Id.)

### 6. THE DAVÉS' COMPENSATION

Giatri Davé's claims continue to be evaluated by the Federal Claims Settlement Commission.  (Id. ¶ 7.)  She is entitled to a minimum award of $500,000 as a U.S. national victim of the Pan Am Hijacking and may be awarded additional injury claims of up to approximately $6 million.  (Id.)

On July 28, 2009, the Commission issued Gargi Davé an award in the amount of $3 million for physical injuries suffered as a result of the Pan Am Hijacking.  (Id. ¶ 97.) Gargi Davé may also be entitled to additional amounts of up to approximately $3 million due to the severity of her physical injury.  (Id. ¶ 7.)

### 7. DEFENDANTS' DEMANDS[7]

In a letter dated November 1, 2009, Crowell & Moring acknowledged the Commission's issuance of Gargi's award and noted that the award had been certified for payment by the U.S. Department of Treasury. (Id. ¶ 98.) In the letter, Crowell & Moring indicated that the Treasury would soon be contacting Gargi Davé to arrange for the method of payment of the award, and requested that upon receiving this communication, she contact the firm "immediately so that [Crowell & Moring] can assist in making arrangements for the payment, in accordance with [her] engagement letter with C&M LLP and the JPA." (Id.) Crowell & Moring requested that Gargi direct the $3 million payment from the U.S. Treasury to the Crowell & Moring client escrow account. (Newberger Decl. ¶ 41.) Plaintiffs allege that Defendants have wrongfully demanded that the Plaintiffs forfeit any award pursuant to the CSA or the Executive Order because such compensation was neither anticipated nor covered by the JPA and in violation of certain various laws and federal policy interests. (FAC ¶ 99.) Plaintiffs further allege that the Liaison Group and Crowell & Moring never discussed that the representation was for the purpose of participating in negotiations between Libya and United States for the settlement of claims. (Id. ¶ 52.) According to the Complaint, if the JPA and C&M Retainer are enforced, Plaintiffs "are in danger of losing approximately 90% of their rightful Compensation for injuries caused by terrorism." (Id. ¶ 101.)

### 8. PLAINTIFFS FILE SUIT AGAINST DEFENDANTS

On January 4, 2010, Plaintiffs filed suit against Defendants Crowell & Moring and the Liaison Group. Plaintiffs filed their First Amended Complaint on January 11,

---

[7]Crowell & Moring contend that the firm has pursued recoveries from the established settlement fund. (Newberger Decl. ¶ 40.) Stuart Newberger, a partner at Crowell & Moring who was directly involved with matters related to the victims' claims against Libya, suggests that Crowell & Moring "prepared the initial submissions of both of the Plaintiffs here, and obtained an initial award of $3 million for Gargi Davé." (Id. ¶ 41.) The firm has made submissions for other members of the JPA, and have obtained $30 million from the State Department without any involvement of the FCSC and over $20 million in awards directly from the FCSC. (Id. ¶ 42.)

2010, which was the same day Defendants filed their Notice of Removal to this Court.
(Mem. at 1 n.1.)

**B. SUMMARY OF PLAINTIFFS' CLAIMS**

Plaintiffs' First Amended Complaint contains nine causes of action.  To
determine whether a federal question is apparent from the face of Plaintiffs' complaint,
a brief discussion of each of Plaintiffs' claims is necessary.

### 1.  Claims for Declaratory Relief

Plaintiffs' first three claims seek a declaratory judgment that the JPA, C&M
Retainer, and arbitration provision in the JPA are unenforceable.

#### a.  First Cause of Action: Declaration of Unenforceability of the JPA

Plaintiffs contend that any compensation award stemming from the CSA,
Executive Order, and LCRA was not contemplated by, and falls outside the scope of,
the terms of the JPA.  (Id. ¶ 105.)  Moreover, Plaintiffs present three central arguments:

### I.  Conflict with Federal Law

Plaintiffs seek a determination regarding whether federal law precludes
enforcement of the JPA.  Plaintiffs assert two arguments on this ground:

(1) Because the JPA provides that all parties to the JPA—including non-U.S.
nationals—will share in any recovery, the JPA is in direct conflict with the LCRA, the
CSA, and the Executive Order, which all provide that the settlement fund shall
compensate U.S. nationals only.  (Id. ¶ 109.)

(2)  Plaintiffs assert that the C&M Retainer's provision allowing for a
contingency fee of 25% of any settlement amount is in direct conflict with 22 U.S.C. §
1623(f), which provides that "[n]o remuneration on account of services rendered on
behalf of any claimant in connection with any claim filed with the Commission under
this subchapter shall exceed 10 per centum of the total amount paid pursuant to any
award certified under the provisions of this subchapter of such claim.  Any agreement to
the contrary shall be unlawful and void."  (Id. ¶ 111.)

### ii.  Lack of Consideration

Under the JPA, "Plaintiffs are obligated to share their settlement fund recovery monies with other Parties to the JPA—including non-U.S. nationals—in consideration for a share in the monies *recovered by other Parties*."  (Id. ¶ 113.)  However, Plaintiff claims that Crowell & Moring failed to provide any consideration to enter into the agreement because the firm had no intention of pursuing the non-nationals' claims in those jurisdictions outside the United States.  (Id. ¶ 115.)

### iii.  Fraudulent Inducement

Finally, Plaintiffs argue that any consent given to enter into the JPA was obtained through Defendants' fraudulent representations.  First, Defendants misrepresented that they would pursue the claims of non-nationals in jurisdictions outside the United States in an effort to maximize recovery for all parties to the JPA.  (Id. ¶ 118.)  Second, Defendants misrepresented that "non-U.S. victims had equal or better chances of recovery against Libya or its agents, and by failing to disclose that should there be any settlement agreement between Libya and the U.S., the U.S. would only be able to represent and satisfy the claims of the U.S. nationals."  (Id. ¶ 119.)  Finally, Plaintiffs' consent was obtained through Defendants' fraudulent omissions that Plaintiffs' claims could and likely would be "espoused" by the U.S. government without the involvement of Crowell & Moring or the Liaison Group.  (Id. ¶ 120.)

#### b.  *Second Cause of Action: Declaration of Unenforceability of the C&M Retainer*

Plaintiffs' second claim seeks a declaration that the C&M Retainer is unenforceable because of conflict with federal law, invalid ab initio due to the lack of consideration, and void because Plaintiffs' consent to enter into the agreement was procured by fraudulent representations.  (Id. ¶ 135-37.)  Specifically, Plaintiffs note that the C&M Retainer's provision allowing for a contingency fee of 25% of any settlement amount is in direct conflict with 22 U.S.C. § 1623(f), which limits payments for services in connection with a claim filed with the Commission to 10%.  (Id. ¶ 125.)

### c.  Third Cause of Action: Declaration of Unenforceability of the Arbitration Agreement

Plaintiffs contend the "arbitration clause in the JPA is inapplicable . . . because Plaintiffs' Compensation did not arise out of the relationship between C&M and the Plaintiffs, as defined in the JPA and C&M retainer, but from the bi-lateral political and diplomatic relations between the U.S. government and Libya as evidenced by the CSA, EO, and LCRA."  (Id. ¶ 139.)  In sum and substance, Plaintiffs' claim seeks a declaration that the arbitration clause is unenforceable as "unconscionable, fraudulent at its inception, and illegal as against public policy and as part of a contract that is void ab initio."  (Id. ¶ 149.)

### 2.  FOURTH, FIFTH AND SIXTH CLAIMS NOT AT ISSUE

Plaintiffs' fourth, fifth, and sixth claims are for breach of fiduciary duty, fraudulent misrepresentation, and negligent misrepresentation, respectively.  However, Crowell & Moring does not dispute that these claims fail to arise under federal law.

### 3.  SEVENTH CAUSE OF ACTION: BREACH OF CONTRACT

Plaintiffs allege that "Defendants C&M and the LG have breached the terms of the JPA by failing to protect the interests of Plaintiffs, and failing to pursue the Parties' common interests against the Libyan defendants in any foreign country, legal system, or other available forum outside of the U.S. in which non-U.S. nationals possess rights to recovery."  (Id. ¶ 211.)

### 4.  EIGHTH CAUSE OF ACTION: INTENTIONAL INTERFERENCE WITH CONTRACT

In this claim, "Plaintiffs seek a declaration of rights under the CSA, EO, and the LCRA to their fair Compensation, to the exclusion of non-U.S. nationals in order to prevent Defendants' future interference with Plaintiffs' known expectations to benefit from their relationship with the U.S.' [sic] compensation scheme."  (Id. ¶ 218.) Plaintiffs allege that "Defendants intentionally directed their demands toward Plaintiffs after the passage of the CSA, EO, and LCRA to induce a breach of the relationship

13

created by the CSA, EO, and LCRA" and that such actions interfered with Plaintiffs'
"rights and entitlements under the CSA, EO and/or LCRA to their Compensation."  (Id.
¶¶ 215-16.)

### 5. NINTH CAUSE OF ACTION: INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGES

Similarly, Plaintiffs allege that Defendants have intentionally demanded and
manifested intent for Plaintiffs to forfeit their rights and entitlements to "fair
compensation" provided for by the CSA, Executive Order, and LCRA.  (Id. ¶¶ 220,
222.)  Therefore, Plaintiffs seek a "declaration of rights" to their fair compensation
under the U.S. compensation scheme.  (Id. ¶ 224.)

### III.
### DISCUSSION

### A. APPLICABLE LAW

### 1. LEGAL STANDARD FOR REMOVAL

Under 28 U.S.C. § 1441(a), "any civil action brought in a State court of which
the district courts of the United States have original jurisdiction, may be removed by the
defendant or defendants, to the district court of the United States for the district and
division embracing the place where such action is pending."  28 U.S.C. § 1441(a).
Generally, the removal statute is strictly construed against removal jurisdiction.
Provincial Gov't of Marinduque v. Placer Dome, Inc., 582 F.3d 1083, 1086 (9th Cir.
2009).  "A defendant seeking removal has the burden to establish that removal is proper
and any doubt is resolved against removability."  Luther v. Countrywide Home Loans
Servicing LP, 533 F.3d 1031, 1034 (9th Cir. 2008) (citing Gaus v. Miles, Inc., 980 F.2d
564, 566 (9th Cir. 1992).   In keeping with these principles, the Court must carefully
scrutinize the pending complaint to determine whether it states a federal question.

### 2. FEDERAL QUESTION JURISDICTION

Under 28 U.S.C. § 1331, "district courts shall have original jurisdiction of all
civil actions arising under the Constitution, laws, or treaties of the United States."  28

U.S.C. § 1331.  "[A] suit arises under the Constitution and laws of the United States only when the plaintiff's statement of his own cause of action shows that it is based upon those laws or that Constitution."  Louisville & Nashville R.R. Co. v. Mottley, 211 U.S. 149, 152 (1908).  A case may "arise under" the laws of the United States if the "well-pleaded complaint establishes either [1] that federal law creates the cause of action or [2] that the plaintiff's right to relief under state law necessarily depends on resolution of a substantial question of federal law."  Franchise Tax Bd. of State of California v. Constr. Laborers Vacation Trust for S. California, 463 U.S. 1, 27 (1983).  "[T]he existence of federal jurisdiction depends solely on the plaintiff's claims for relief and not on anticipated defenses to those claims."  ARCO Envtl. Remediation, L.L.C. v. Dep't of Health and Envtl. Quality, 213 F.3d 1108, 1113 (9th Cir. 2000).

### a. Plaintiffs' Declaratory Judgment Claims Do Not Confer Federal Question Jurisdiction On This Court

In this case, several of Plaintiffs' claims seek declaratory relief pursuant to California's Declaratory Judgment Act, California Civil Procedure Code § 1060.  First and foremost, these claims rest on the proposition that the relevant agreements cannot be read to give Crowell & Moring and members of the Liaison Group rights in a recovery achieved through some process other than Crowell & Moring's litigation efforts on behalf of the group.  In short, the fundamental task for the trial court in this case will be to construe the agreements between the parties, an endeavor that presents no federal question.  But there is no doubt that Plaintiffs also raise federal defenses to the two agreements and seek a declaration that the JPA and the C&M Retainer are rendered invalid by intervening federal law.  The question is whether the request for such a declaration gives rise to federal jurisdiction in this case.  The controlling cases hold that it does not.

In Skelly Oil, supra, the Supreme Court held that the Declaratory Judgment Act is procedural only, and does not extend the jurisdiction of the federal courts. 339 U.S. at 671.  As construed in later Supreme Court decisions, Skelly Oil stands for the

proposition that "if, but for the availability of the declaratory judgment procedure, the federal claim would arise only as a defense to a state created action, jurisdiction is lacking." Franchise Tax Bd. of State of California v. Constr. Laborers Vacation Trust for S. California, 463 U.S. 1, 16 (1983) (citation omitted). Moreover, Franchise Tax explicitly held that the analysis in Skelly Oil extends to state declaratory judgment actions. Franchise Tax, 463 U.S. at 18-19.

To avoid application of this rule, Crowell & Moring asserts that Plaintiffs invoke federal law to invalidate the relevant agreements and thus use federal law as a "sword." The metaphor does not trump the rule.[8] Plaintiffs correctly note that Defendants are improperly and inaccurately characterizing Plaintiffs' claims as affirmative claims arising under federal law. Although the result of Plaintiffs' action might be modification and/or nullification of an existing agreement, Plaintiffs' use of the declaratory judgment procedure in this case does not transform their causes of action into affirmative claims. On this point, Skelly Oil and Franchise Tax teach that the declaratory judgment procedure must be looked at from the perspective of the coercive action. Where the coercive action would be brought by the declaratory judgment defendant, the Court must consider the nature of that coercive action. In this case, Crowell & Moring and the Liasion Group would be bringing the coercive action to recover funds obtained by the Davés in a suit for breach of contract—an action that plainly arises under state law.

If Skelly Oil and Franchise Tax left any doubt as to how this case should be resolved, those doubts have been resolved in Ninth Circuit jurisprudence. "A declaratory judgment action may be entertained in federal court *only if* the coercive

---

[8]Crowell & Moring also contends that the effect of voiding the JPA would call into question tens of millions of dollars already accumulated in the trust, which Plaintiffs argue should be distributed only to U.S. citizens, not to the many foreign nationals who were members of the JPA. (Opp. at 15.) In this way, claims Crowell & Moring, Plaintiffs seek to invoke federal law to restructure the relationship between the parties to these agreements. (Opp. at 14.) Perhaps so, but since the restructuring would result from the assertion of a federal defense to a state claim, the fact that the parties' relationship may end up restructured is immaterial to a determination of the jurisdictional issue.

16

action that would have been necessary, absent the declaratory judgment procedure, could have been heard in federal court." Guar. Nat. Ins. Co. v. Gates, 916 F.2d 508, 511 (9th Cir. 1990) (emphasis added); see also Armstrong v. Armstrong, 696 F.2d 1237, 1238 (9th Cir. 1983) (holding that a federal defense is not "transformed into a federal cause of action by assertion of a claim for defensive declaratory relief"). "A claim does not arise under federal law within the meaning of section 1331 where it relies on federal law only to establish an immunity or defense which would preclude the declaratory judgment defendant from successfully litigating against the declaratory judgment plaintiff a claim arising under state law." Alton Box Bd. Co. v. Esprit de Corp., 682 F.2d 1267, 1274 (9th Cir. 1982). "To permit a party by 'artful pleading' to 'anticipate[] a defense based on federal law' and thus bring within federal jurisdiction a case that could not otherwise be heard in a federal court would 'disregard the effective functioning of the federal judicial system and distort the limited procedural purpose of the Declaratory Judgment Act.'" Id. (citing Skelly Oil, 330 U.S. at 673-74).[9]

Here, Defendants' coercive action for breach of contract to *enforce* the JPA and the C&M Retainer is governed by state law. To assert its coercive breach of contract claim pursuant to the JPA, the Liaison Group would need to establish that: (1) the agreement required that any proceeds, regardless of how they were obtained, be shared among group members; and (2) that Plaintiffs obtained a recovery and failed to share their recovery reward with non-U.S. nationals, as required under the JPA. Similarly, Crowell & Moring would need to show that Plaintiffs failed to pay Crowell & Moring 25% of their compensation award as required under the C&M Retainer. Neither of these claims arises under federal law. Viewed in this light, the federal issues raised in the declaratory relief action are revealed to be defensive and not affirmative federal claims for relief. The claims therefore do not arise under federal law.

In sum, without the declaratory judgment procedure, Plaintiffs would have been

---

[9] Of course, the converse is also true. If the defendant's coercive action would necessarily raise a federal question, the declaratory judgment suit can be brought in federal court. Franchise Tax, 463 U.S. at 19.

required to wait until Crowell & Moring and the Liaison Group brought a coercive

action, which would necessarily have been filed in state court.  See Mottley, 211 U.S. at

152 ("It is not enough that the plaintiff alleges some anticipated defense to his cause of

action, and asserts that the defense is invalidated by some provision of the

Constitution.").  At that point, they could have raised the federal issues in defense

against the claims.  Accordingly, this declaratory relief action, which asserts those

defenses affirmatively in the FAC, fails to establish a basis for the assertion of federal

question jurisdiction in this case.

### b.  Crowell & Moring's Authorities Do Not Support the Exercise of Federal Question Jurisdiction

Crowell & Moring cites a number of decisions in support of its claim that this

case presents a federal question.  According to Defendants, these cases stand for the

proposition that "[f]ederal courts have long exercised jurisdiction over cases 'in which

the court is asked to declare a contract illegal' under federal law." (Opp. at 14.)  That

contention is overly simplistic and does not advance the firm's position in this case.[10]

In South Side Theatres v. United W. Coast Theatres Corp., Plaintiff and

Defendant entered into a written agreement for the joint operation of the theatres and

buildings in which they were situated for the term of ten years.  178 F.2d 648, 649 (9th

Cir. 1950).  The parties also entered into a written contact that provided for the

termination of the venture upon the happening of certain events, including the entry of a

decree in an action brought by the United States requiring a party to the agreement to

terminate or nullify the agreement.  Id. at 650.  When the Southern District of New

York held that Plaintiff's parent corporation, Twentieth Century, could not enter into

---

[10]Plaintiffs' reliance on Opera Plaza Residential Parcel Homeowners Ass'n v. Hoang is misplaced. 376 F.3d 831, 833 (9th Cir. 2004).  First, the district court concluded, and the Ninth Circuit affirmed, that there was no federal question jurisdiction in that case.  The circuit reiterated that the federal statute and regulations that were potentially in issue gave rise, at most, to possible defenses to the claim and therefore not a basis for asserting federal question jurisdiction.  Second, the case involved an effort by the Plaintiff to enforce a contract through a declaratory relief action, not to invalidate it.  Thus, it was not a case in which the court was asked "to declare a contract illegal under federal law."

such theatre-pooling agreements, plaintiffs sought a declaration that the relevant

agreements be terminated.  Id. at 650-51.  Although plaintiffs asserted their right

pursuant to the provisions of the termination contract, the Court found that the

complaint amounted to a coercive action under the Sherman Act, and held: "An action

in which the court is asked to declare a contract illegal under the Sherman Act and that

the defendants are engaged in unlawful restraint of trade presents a federal question

sufficient to give a district court jurisdiction."  Id. at 651.  Accordingly, the case stands

for the unremarkable proposition that a declaratory relief action that states a claim under

another federal statute arises under federal law.

Defendants claim support in two district court cases that have no precedential

authority in the first instance, and that are readily distinguishable even if considered on

their merits.  In 625 3rd St. Assocs., LP v. Alliant Credit Union, Plaintiff entered into a

fifteen-year lease agreement with Kaiperm Federal Credit Union ("Kaiperm").  2009

WL 1139592, at *1 (N.D. Cal. Apr. 28, 2009).   The lease was ultimately repudiated by

the National Credit Union Association ("NCUA"), the association's regulator, after it

placed the institution in involuntary liquidation, reorganized its operations and

transferred assets, except the lease, to Alliant as the successor institution.  Id.  When

Plaintiff attempted to enforce the lease agreement, the district court determined that a

substantial, disputed federal question was presented arising out of the "NCUA's

regulatory powers and the actions NCUA took with respect to Kaiperm's liquidation."

Id. at *3.  Because Plaintiff's claims required considered and resolution of the effect of

the NCUA's actions, a federal question was raised.  Id. at *3-4.  No such consideration

and resolution is required in this case.

In Koresko v. Murphy, Plaintiff entered into an agreement with Defendants for

the purchase of a pickup truck.  464 F. Supp. 2d 463, 465 (E.D. Pa. 2006).  Plaintiff later

sought to rescind the agreement based on Defendant's failure to make disclosures

required under federal law, which Plaintiff characterized as "a condition precedent to the

contract"  Id.; see 49 U.S.C. § 32705 (requiring disclosure of cumulative mileage upon

transfer). In short, an essential element of Plaintiff's affirmative case involved proof that Defendant violated federal law. The district court concluded that this element was enough to raise a substantial, dispute question of federal law giving rise to jurisdiction under the rule stated in <u>Grable & Sons Metal Prod., Inc. v. Darue Eng'g & Mfg.</u>, 545 U.S. 308 (2005). 464 F. Supp. 2d at 467-69. This case does not require such a determination.

Plaintiffs correctly point out that these cases do *not* hold that the assertion of federal law as a defense confers federal question jurisdiction on the court. Instead, the cases apply the standard in <u>Grable</u>, <u>supra</u>, concluding that plaintiffs' state law claims necessarily required the resolution of federal law. Nor do the cases contain any discussion of a declaratory relief action that seeks to invalidate a contract based on a defense to enforcement. Here, Plaintiff's declaratory relief claims clearly allege that the contract cannot be enforced because of contrary and conflicting federal law and policy. <u>Alliant</u> and <u>Koresko</u> are inapposite to the declaratory judgment analysis under <u>Skelly Oil</u> and <u>Franchise Tax</u>.

### c. *Federal Question Jurisdiction under <u>Grable</u>*[11]

Defendants contend that three of Plaintiffs' state law claims—those for breach of contract, intentional interference with contract, and intentional interference with prospective economic advantage—"necessarily" turn on substantial questions of federal law. (Opp. at 17-25.) The Supreme Court has held that a federal court may exercise federal question jurisdiction if a state-law claim "necessarily raise[s] a stated federal issue, actually disputed and substantial, which a federal forum may entertain without

---

[11]The LCRA, Executive Order, and CSA do not grant Plaintiffs a private right of action. <u>See</u> <u>Medellin v. Texas</u>, 552 U.S. 491, 506 n.3 (2008) (citation omitted) ("Even when treaties are self-executing in the sense that they create federal law, the background presumption is that "[i]nternational agreements, even those directly benefitting private persons, generally do not create private rights or provide for a private cause of action in domestic courts.") Defendants have failed to provide any legal authority that suggests the LCRA, Executive Order, or CSA create a federal private right of action. Nor do the terms of the LCRA, Executive Order, or CSA appear to provide for one. Therefore, Plaintiffs' claims do not give rise to a federal cause of action.

1    disturbing any congressionally-approved balance of federal state judicial
2    responsibilities." Grable, 545 U.S. at 314.

3           In Grable, the Internal Revenue Service seized real property owned by Grable to
4    satisfy a federal tax delinquency, and gave Grable notice by certified mail before selling
5    the property to the defendant. Id. at 310.  Grable subsequently brought a quiet title
6    action in state court, claiming that the defendant's title was invalid because federal tax
7    law required the IRS to give Grable notice of the sale by personal service as required by
8    26 U.S.C. § 6335(a). Id. at 311.  The defendant removed the case to federal court on the
9    grounds of federal question because the title claim depended on an interpretation of
10   federal tax law. Id.  The Court deemed the case removable because the issue of whether
11   the IRS gave Grable proper notice under applicable federal tax law was an essential
12   element of his claim, was actually in dispute, and was the only disputed issue in the case.
13   Id. at 315.   The Court noted that its ruling was limited to cases that involve (1) a
14   contested federal issue, (2) involving or implicating a substantial federal interest, (3) but
15   even then only if federal jurisdiction "is consistent with congressional judgment about
16   the sound division of labor between state and federal courts . . . ." Id. at 314.  The
17   Supreme Court noted that the case was the rare state title action that raises a contested
18   matter of federal law; "federal jurisdiction to resolve genuine disagreement over federal
19   tax title provisions will portend only a microscopic effect on the federal-state division of
20   labor." Id.

21          In those words, Grable made clear that the rule provides a very narrow basis for
22   the exercise of federal question jurisdiction, and that the identification of a disputed
23   federal issue is not "a password opening federal courts to any state action embracing a
24   point of federal law." Id.  This principle was reiterated in Empire Healthchoice
25   Assurance, Inc. v. McVeigh, where the Supreme Court reaffirmed Grable's holding that
26   it takes more than a federal element "to open the 'arising under' door."  547 U.S. 677,
27   701 (2006) (citing Grable, 545 U.S. at 313).  The presence of a federal issue is not "a
28   password opening federal courts to any state action embracing a point of federal law."

Grable, 545 U.S. at 314.  As Empire noted, the issue raised in Grable addressed a pure question of law that: (1) would govern the ongoing conduct of a federal agency; and (2) would be controlling in numerous other cases.  547 U.S. at 700.  Empire, on the other hand, involved an effort by an insurer to obtain reimbursement from proceeds obtained by a federal worker in state court tort litigation.  Concluding that Empire and Grable were "poles apart," the Supreme Court concluded:

> The United States no doubt "has an overwhelming interest in attracting able workers to the federal workforce," and "in the health and welfare of the federal workers upon whom it relies to carry out its functions." Id., at 10. But those interests, we are persuaded, do not warrant turning into a discrete and costly "federal case" an insurer's contract-derived claim to be reimbursed from the proceeds of a federal worker's state-court-initiated tort litigation.

Id. at 701.  Likewise, the federal government no doubt has a significant interest in obtaining recoveries for victims of the Pan Am 73 terrorist attack, but that does not warrant turning Crowell & Moring's contract claim into a federal case because federal issues may arise in the context of the contract litigation.

With that as background, the Court considers whether the contract and tort claims require the resolution of a substantial federal question of such significance that it should be resolved in a federal forum.

## I.  Breach of Contract

Under the terms of the JPA, Crowell & Moring agreed to "pursue their common interests against the Defendants under any applicable state and/or federal law, in any court having jurisdiction, *in any country or legal system or other available forum* and that to pursue those common interests they desire to proceed in the most efficient, cost effective manner *to maximize any potential recovery for all the Plaintiffs* . . . ."  (FAC ¶ 209.)  Plaintiffs allege Defendants breached the JPA by failing to protect the interests of Plaintiffs and failing to pursue their interests in any foreign country legal system or other available forum outside the U.S. in which non-U.S. nationals possess rights to recovery. Under California law, to prevail on a breach of contract claim, Plaintiffs must establish: (1) the existence of a contract; (2) performance by Plaintiffs or excuse for

1   nonperformance; (3) Defendants' breach; and (4) resulting damage to Plaintiffs.

2   Reichert v. General Ins. Co., 442 P.2d 377, 381 (Cal. 1968).

3        Plaintiffs' breach of contract claim does not even mention the LCRA, Executive

4   Order, or CSA.  The Court need only look at the four corners of the JPA to determine

5   whether Defendants complied with their obligations.  In this claim, there is no actually-

6   disputed federal issue.  Defendants contend that Plaintiffs' complaint clearly indicates

7   that Plaintiffs are not currently honoring their obligations under the JPA and C&M

8   Retainer, and that Plaintiffs must therefore prove that their failure to perform was

9   excused—presumably by reference to federal law.  (Opp. at 21.)  However, Defendants'

10  argument stretches Plaintiffs' allegations too far.  Plaintiffs allege that they "have

11  performed their obligations under the JPA."  (FAC ¶ 210.)  Based on Plaintiffs'

12  allegations, no determination regarding whether federal law excused Plaintiffs'

13  contractual obligations is necessary.  A court need only look to the contract and

14  Defendants' conduct to determine whether Defendants properly complied with the terms

15  of the JPA.  However, even if resolution of the claim required reference to or

16  consideration of federal law, Empire teaches that that is not enough to confer federal

17  jurisdiction over the dispute.  This case plainly does not involve an issue with nationwide

18  impact in every lawsuit of a certain type brought by an important federal agency.  Thus,

19  even if the contract claim required the resolution of some federal issue, that issue is not

20  of sufficient significance to warrant the exercise of federal question jurisdiction.

21              **ii.  Intentional Interference with Prospective Economic**

22                  **Advantage**

23        Plaintiffs' ninth cause of action alleges a claim for intentional interference with

24  prospective economic advantage.  (FAC ¶¶ 219-24.)  To prove this claim, a plaintiff

25  must show: "(1) an economic relationship between plaintiff and a third party, with the

26  probability of future economic benefit to the plaintiff; (2) defendants' knowledge of the

27  relationship; (3) an intentional act by the defendant, designed to disrupt the relationship;

28  (4) actual disruption of the relationship; and (5) economic harm to the plaintiff

proximately caused by the defendant's wrongful act, including an intentional act by defendant that is designed to disrupt the relationship between the plaintiff and a third party."  Edwards v. Arthur Andersen LLP, 189 P.3d 285, 290 (Cal. 2008) (citing Korea Supply Co. v. Lockheed Martin Corp., 63 P.3d 937, 950 (Cal. 2003).

Plaintiffs specifically allege that the CSA, LCRA, and Executive Order "create an economic relationship between the Plaintiffs and the U.S. and Libya, from which the Plaintiffs' rights and entitlements to 'fair compensation' under those agreements originate."  (FAC ¶ 220.)  According to Plaintiffs,  Crowell & Moring disrupted this relationship by demand[ing] . . . that Plaintiffs forfeit those rights pursuant to unenforceable agreements, the JPA, and C&M Retainer."  (Id. ¶ 223.)

To determine whether Plaintiffs' claims present a federal question, the Court must examine whether the federal issue is "actually disputed and substantial."  Grable, 545 U.S. at 314 (emphasis added).  Indeed, Grable emphasized that "the federal issue in a state law claim must actually be in dispute to justify federal question jurisdiction," and highlighted "the requirement of an actual dispute about federal law."  545 U.S. at 316 n.3 (citing Shulthis v. McDougal, 225 U.S. 561, 569-70 (1912)).  Without such a dispute, there can be no federal question jurisdiction.

Empire, discussed above, provides one example of how a lawsuit may arise in a federal context without giving rise to federal jurisdiction.  A recent Sixth Circuit decision provides another illuminating example.  In Eastman v. Marine Mech. Corp., the plaintiff sued his employer for wrongful termination in violation of public policy.  438 F.3d 544, 548 (6th Cir. 2006).  The plaintiff contended that the public policies were based entirely on various federal statutes, including but not limited to, 18 U.S.C. § 287 and 31 U.S.C. § 3729, prohibiting the submission of false claims to the federal government.  Id.  The Sixth Circuit found that "the meaning of the two statutes cited by the plaintiff is not in serious dispute in this case," as neither party could dispute that "submitting fraudulent claims to the federal government would contravene national policy."  Id. at 552.  The court ultimately concluded that "the federal statutes cited as a

source of public policy [do] not create a substantial federal question in this case," and remanded.  Id. at 552-53; see also Stern v. Baldwin, 2010 WL 1142034, at *3 (D.N.J. March 24, 2010) (Because "federal statute's meaning" was not disputed, "remand [was] appropriate.").

In this case, it is clear that Plaintiffs' so-called "rights and entitlements" under federal law are not actually in dispute. (FAC ¶ 223.)  In fact, both parties agree that Plaintiffs are entitled to compensation from the federal government through the State Department's negotiated settlement of claims against Libya.  Plaintiffs plead that federal law creates their "economic relationship" with the federal government. (Id. ¶ 220.) Crowell & Moring can hardly dispute that fact since it seeks a piece of the action, contending only that Plaintiffs' award should be distributed in accordance with the JPA and C&M Retainer.  In short, it is Crowell & Moring's demand that allegedly interferes with Plaintiffs' rights to funds from the negotiated settlement with Libya, and that demand does not present a federal question.  Accordingly, because the only federal component of Plaintiffs' intentional interference with prospective economic advantage claim is not "actually disputed," Grable, 545 U.S. at 314, there is no federal question underlying this particular claim that would give rise to this Court's jurisdiction.

### iii.  Intentional Interference with Contract

Plaintiffs' eighth cause of action is for intentional interference with contract. (FAC ¶¶ 215-18.) "The elements of a cause of action for intentional interference with contract are: (1) a valid contract between plaintiff and a third party; (2) defendants' knowledge of the contract; (3) defendants' intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage." Tuchscher Dev. Enters., Inc. v. San Diego Unified Port Dist., 132 Cal. Rptr. 57, 74 (Ct. App. 2003) (citations omitted); see also Guidiville Band of Pomo Indians v. NGV Gaming, Ltd., 531 F.3d 767, 774 (9th Cir. 2008).

Clearly, to state their intentional interference with contract claim, Plaintiffs must

point to the existence of some contract or contractual right.  However, the CSA, LCRA, and Executive Order do not provide Plaintiffs with any "rights and entitlements" to which they could assert private contractual claims.  "Even when treaties are self-executing in the sense that they create federal law, the background presumption is that '[i]nternational agreements, even those directly benefitting private persons, generally do not create private rights or provide for a private cause of action in domestic courts.'" Medellin, 552 U.S. at 506 (citation omitted).  In Medellin, the Supreme Court specifically cited a number of Courts of Appeals which have "presumed that treaties do not create privately enforceable rights in the absence of express language to the contrary."  Id. (citations omitted).  Moreover, the Executive Order specifically disclaims the creation of any private rights.  See Exec. Order No. 13,477, 73 Fed. Reg. 65,965 (Oct. 31, 2008) ("This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, instrumentalities, or entities, its officers or employees, or any other person.").

    Where, as here, federal law expressly denies Plaintiffs any enforceable rights, they cannot reasonably argue that the LCRA and Executive Order create the contractual "rights and entitlements" necessary to state the interference-with-contract claim. Because Plaintiffs cannot plead the existence of a contract based on the federal laws and international agreements at the heart of this case, their interference-with-contract claim is wholly insubstantial and facially defective.  Likewise, Crowell & Moring cannot enlarge this Court's jurisdiction simply by pointing to Plaintiffs' imagined federal contract right. The Court concludes that a "substantial" federal question is not "necessarily" raised in the interference-with contract claim, Grable, 545 U.S. at 314, and this claim also fails to support the Court's jurisdiction.[12]

---

[12]Crowell & Moring's final fallback argument is to contend that the issues presented are of federal concern and more properly decided in federal court. This argument also fails. The central inquiry in this portion of Grable is whether cases will be shifted from the state system to the federal system.  Acceptance of

**IV.**

**CONCLUSION**

For the foregoing reasons, Plaintiffs' motion to remand is **GRANTED**. Accordingly, Plaintiffs' <u>ex parte</u> application for a temporary restraining order is hereby **DENIED** as moot.


**IT IS SO ORDERED.**


DATED: May 4, 2010

_____
Judge Gary Allen Feess
United States District Court

---

Crowell & Moring's position would permit federal jurisdiction "whenever a plaintiff sues on a state law that refers to a concept defined by federal law."  <u>Shanks v. Dressel</u>, 540 F.3d 1082, 1093-94 (9th Cir. 2008) (citing <u>Grable</u>, 545 U.S. at 318).  The mere presence of <u>any</u> federal issue in a state law tort claim would allow for federal question jurisdiction.  This is the precise case where federal law is at issue, and even necessarily so, but is neither in dispute nor central to Plaintiffs' state law claim.  As the Supreme Court in <u>Merrell Dow</u> stated, "the presence of the federal issue as an element of the state tort is not the kind of adjudication for which jurisdiction would serve congressional purposes and the federal system." 478 U.S. at 813.